THOMAS D. SULLIVAN III, Plaintiff-Appellant, v. RETIREMENT BOARD OF FIREMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO, Defendant-Appellee.

First District (4th Division)   No. 1—93—3582

Opinion filed September 22, 1994.—Modified opinion filed November 10, 1994.—Rehearing denied November 17, 1994.

Dowd & Bloch, of Chicago (J. Peter Dowd, Robert E. Bloch, and Linda Wyetzner, of counsel), for appellant.

Fagel & Haber, of Chicago (Steven J. Teplinsky and Sara L. Thomas, of counsel), for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

Plaintiff, Thomas D. Sullivan III, sought administrative review from a decision of the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago (Board), denying his application for duty-related disability benefits. (40 ILCS 5/6—151 (West 1992).) The trial court affirmed the denial of benefits and plaintiff now appeals from this judgment, raising the following issues: (1) whether the Board's decision was contrary to the manifest weight of the evidence; (2) whether the Board denied plaintiff a fair hearing and due process; and (3) whether the trial court erred in denying plaintiff's request to amend his complaint to add a claim for nonduty disability benefits.

Plaintiff was employed as a paramedic with the Chicago fire department (Department) for nine years until July 23, 1991, when he suffered the back injury for which he now seeks benefits. Following the accident, plaintiff remained on paid disability leave for one year until July 23, 1992, when he was removed from the payroll. Plaintiff subsequently applied for permanent duty-disability benefits under section 6—151 of the Illinois Pension Code (Code)(40 ILCS 5/6—151 (West 1992)). A hearing was held on his application on November 18, 1992, and the following evidence was adduced before the Board.

Plaintiff testified that on July 23, 1991, he and other paramedics were attempting to hoist a stretcher bearing a 400-pound patient. When one of the paramedics failed to lift his end, the entire load shifted onto plaintiff. Plaintiff initially struggled to support the stretcher, but then felt a "pop" in his back and severe pain and collapsed under the weight. Plaintiff testified that he immediately began to "spasm and tighten up" and that within a short time period he "tightened up" from his shoulder blades to his buttocks. Plaintiff was subsequently taken to the hospital, where the emergency room physician gave him pain medication and instructed him to remain in bed.

About one week later, plaintiff consulted with the fire department's medical director, Dr. Hugh Russell, who referred him to orthopedic surgeon Dr. Robert J. Daley. After examining plaintiff, Daley sent Russell an evaluation letter in which he diagnosed plaintiff's condition as lumbar radiculopathy with degenerative disc changes and transitional vertebrae. Daley noted that plaintiff had a history of duty-related back injuries and recommended that he undergo a magnetic resonance imaging scan (MRI) and an electromyogram (EMG) for further analysis. Daley placed plaintiff on a physical therapy schedule and ordered him to remain off work.

Plaintiff remained under Daley's care until February of 1992, consulting with him about once every three weeks. During this time, he underwent physical therapy two or three times per week and was treated with muscle relaxants and steroids. Throughout the fall of 1991, Daley sent reports to Russell tracking plaintiff's progress. These reports, which were contained in the record, reflected that plaintiff had derived some benefit from treatment but was still in significant discomfort and that Daley felt he was not progressing well in therapy. Daley noted that plaintiff's MRI scan taken in August 1991 reflected mild bulging of the L1 and L2 intervertebral discs and desiccation of the disc space between L5 and S1, all in the vicinity of the lower to lower-middle back. Plaintiff's EMG was consistent with S1 radiculopathy on the left. In one early progress letter, Daley expressed hope that plaintiff could return to work in the future, noting that he had reported significant progress in pool therapy; however, throughout the remainder of the six-month period in which plaintiff was under Daley's care, Daley consistently instructed that plaintiff was not yet capable of returning to his duties as a paramedic.

Daley advised plaintiff that he may require epidural steroid injections or back surgery in order for his condition to improve. Desiring a second opinion, plaintiff scheduled an appointment for a consultation with a neurological surgeon, Dr. Michael J. Jerva. In the meantime, the Department instructed plaintiff to undergo a "functional capacity evaluation," which plaintiff did. The specialist who administered this evaluation concluded that plaintiff demonstrated low functional capacities and deconditioning and that he was not ready to meet the critical demands of paramedic work. The specialist observed, however, that plaintiff at times terminated the weight-lifting programs with nonspecific complaints of pain and that he did not demonstrate behaviors consistent with his high reports of pain to the lower back. The specialist recommended that plaintiff undergo a "B200" evaluation for a more objective analysis.

Two weeks later, plaintiff took the B200 test, which is a two-hour,

computerized weight-lifting test. Plaintiff testified that he was instructed to "go all out" in his efforts and that any failure to fully exert himself would be detected through the computer. The B200 test results showed that plaintiff performed with "consistent effort"; nonetheless, he ranked below the tenth percentile in range of motion testing, in the thirtieth percentile for "functional back strength," and below the tenth percentile in isometric tests. According to plaintiff, these tests caused him to suffer a relapse in his symptoms necessitating additional specialized physical therapy.

On January 25, 1992, plaintiff went for his consultation with Jerva. After reviewing plaintiff's recent medical history, Jerva reaffirmed Daley's diagnosis of lumbar radiculopathy and spondylosis, noting evidence of "desiccation of the L5-S1 intervertebral disc with protrusion at that level." Jerva recommended, however, that plaintiff's tests including the MRI be updated prior to any further interventional treatment.

Jerva also recommended that plaintiff undergo a myelography examination to determine the feasibility of back surgery. Jerva noted, however, that plaintiff had previously suffered a life-threatening anaphylactic reaction to the iodine dye used in myelography; thus, he referred him to an allergist to explore the possibility of desensitizing him prior to the test. The allergist, Dr. Dolly Thomas, reported that plaintiff was at "high risk" for an allergic reaction to myelography, and urged if the test was indeed "essential," that it be done with great caution, that plaintiff be hospitalized and closely monitored both before and afterward, and that the test be administered with emergency staff and equipment standing by.

On May 1, 1992, after plaintiff's updated testing, Jerva reported that lumbar spine X rays showed narrowing of the T12 and L1 and L2 disc spaces with no evidence of instability. He further found that the EMG and nerve conduction study were normal, as was a radioisotopic bone scan. Jerva determined, however, that plaintiff's second MRI scan, taken March 19, 1992, revealed "extensive degenerative changes of the facet joints with degenerative cyst formations at multiple levels and compromise of the left neural foramen at the L5 level." There was no evidence of herniation. Jerva again recommended that plaintiff take a myelogram despite its risks to ascertain whether surgery would be beneficial.

In May of 1992, plaintiff began treatment with another orthopedic surgeon, Dr. Michael R. Treister. In early July 1992, Treister determined that there was tenderness "from L2 to the sacrum" mostly in the upper lumbar area. Treister noted that although plaintiff's symptoms were mostly in the left lower back, he could not

determine any measurable atrophy on that side, and suggested that plaintiff undergo a myelogram and post-myelogram CT scan to determine exactly "what was going on" in the left lower portion of his back. Treister emphasized, however, that at the T12 and L1 disc level, there was significant degeneration which precluded plaintiff from any moderate to heavy lifting now or in the future; accordingly, Treister concluded that plaintiff would be permanently unable to perform the duties of a paramedic. Treister further concluded that because there had been no indication of pathology prior to plaintiff's 1986 duty-related injury, and in light of the obvious and significant advancement of the current pathology at plaintiff's relatively young age, it was "reasonable to assume" that plaintiff's condition was the result of his previous work-related accidents.

After the conclusion of plaintiff's case, the Board's attorney presented the testimony of Dr. George Motto, a consulting physician employed by the pension fund. Motto examined plaintiff in September of 1992, and testified that he was incapable of returning to work as a paramedic. Motto testified that he found tenderness in plaintiff's paraspinal muscles especially within the left lumbar region, and a markedly reduced range of motion. Motto explained that the "T-12 and L-1" disc levels referred to an area in the middle back while the "L-5 and S1" levels were located at the lower end of the spine just above the sacrum. Motto testified that plaintiff's August 1991 EMG showed radiculopathy, or nerve pathology, in the area of the left lower spine. When questioned regarding the March 1992 MRI scan, Motto explained that the "extensive degenerative changes" of the facet joints were abnormalities occurring with aging and wear and tear on the back. The "degenerative cyst formations," which could be seen at multiple levels of plaintiff's spine, indicated areas of lucency or decrease in signal, or bone pathology. Motto testified that spinal cysts were always degenerative and that they presented objective evidence of pain. He also indicated that the facet degeneration would cause pain, but that it would be localized.

Motto noted that although Treister had concluded that plaintiff could no longer work due to severe degeneration at the T-12 and L-1 level, the MRI scans had showed no bulging discs in that area. Motto acknowledged that the July 23, 1991, accident could certainly have contributed to plaintiff's present condition; but he also indicated the condition could have been attributable to the aging process or plaintiff's own malingering. He testified, however, that it would have been impossible for a patient to falsify EMG results. Additionally, Motto characterized the functional capacity examination as the most objective means of demonstrating plaintiff's functional capacity.

Finally, Motto confirmed that there was an increased risk of fatality during a myelogram for patients who have demonstrated an allergy to iodine.

The findings of Department medical director Russell were introduced into evidence. Russell indicated that plaintiff was evaluated by orthopedic services with extensive testing by MRI scan, EMG, and nerve conduction velocity studies, "all of which were negative for any lumbar sacral radiculopathy." Russell then noted that plaintiff "refused to cooperate" with his orthopedic attending physician, who ordered a myelogram study. Russell also noted that plaintiff's neurological and orthopedic surgeons were unable to find any pathology to explain his pain, and concluded that "all x-ray studies, EMG and physical examination conducted, thus far, failed to demonstrate any pathology of his spine. No disabling pathology exist."

At the conclusion of the hearing, the Board deliberated and announced its decision to deny plaintiff's application. On November 19, 1992, the Board's secretary notified plaintiff by mail that he had been denied benefits "for the reason that there [was] not sufficient evidence to substantiate" that he was disabled, under section 6—151 of the Code. The Board entered no findings of fact or conclusions of law to support its decision.

Plaintiff subsequently sought administrative review, and following a hearing, the court affirmed the decision of the Board. The instant appeal followed.

Plaintiff argues that the Board's finding was contrary to the manifest weight of the evidence. Defendant responds that given the deferential standard of review, Russell's findings and portions of Motto's testimony alone were sufficient basis to affirm the Board's decision. We disagree.

An agency's factual findings are entitled to great deference on administrative review, and this court should not reweigh evidence or substitute its judgment for that of the Board. (*Zien v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1992), 236 Ill. App. 3d 499, 507, 603 N.E.2d 777; *Hodges v. Board of Trustees of the City of Granite City Police Pension Fund* (1979), 73 Ill. App. 3d 978, 982, 392 N.E.2d 417.) Nevertheless, when an administrative order is contrary to the manifest weight of the evidence, it is this court's duty to reverse it. *Zien*, 236 Ill. App. 3d at 507; *Iwanski v. Streamwood Police Pension Board* (1992), 232 Ill. App. 3d 180, 196-97, 596 N.E.2d 691.

Under section 6—151 of the Code, a fireman is entitled to duty disability benefits if he is disabled as a result of injuries incurred in the course of his duties. (40 ILCS 5/6—151 (West 1992).) The terms of

the Code should be liberally construed in favor of the applicant in order to achieve its beneficent purpose. *Zien*, 236 Ill. App. 3d at 507.

The trial court determined that Russell's findings, corroborated by Motto's testimony, were sufficient to sustain the Board's decision that plaintiff was not disabled. We do not agree. Russell's relatively perfunctory report misstates the results of plaintiff's tests and cannot be reconciled with the findings of the medical professionals who examined and treated plaintiff. While Russell concluded there was no disabling pathology to explain plaintiff's pain, Daley, Treister, and Board physician Motto certified that the condition of his back rendered him incapable of returning to work as a paramedic. Additionally, the results of plaintiff's functional capacity examination, which Motto characterized as the most objective measure of plaintiff's ability to function, demonstrated that plaintiff was unable to perform the tasks of his job. In the B200 examination, plaintiff exerted consistent effort and yet scored below the tenth percentile in range of motion and isometric tests, and in the thirtieth percentile for functional back strength. Russell's report, inexplicably, contains no mention of these results.

Russell's conclusion that plaintiff's EMG and MRI tests "were negative for any lumbar sacral radiculopathy" was directly contradicted by the findings of Daley, Jerva, and Treister, who found evidence in the first MRI of radiculopathy in the lumbar spine. Further, although Russell stated that all of plaintiff's tests were normal, this was in fact true only for his latest EMG; according to Jerva, the most recent MRI scan revealed "extensive" degeneration of the facet joints and degenerative cyst formations at multiple levels of plaintiff's spine. Motto testified that such degeneration provided objective evidence of back pain. Additionally, Treister reported significant degeneration near the lower thoracic region of plaintiff's spine which he felt would preclude plaintiff from any moderate to heavy lifting now or in the future. In light of the inaccuracies in Russell's report and its failure to address what was clearly evidence of disability, we find his recommendation to be questionable at best.

Defendant vaguely suggested that plaintiff's condition was the result of his own malingering or some other nonduty cause. Although Motto did acknowledge that malingering could be a factor contributing to such conditions, we found no such evidence in the record in this case. Russell dismissed plaintiff as "uncooperative" for "refusing" to undergo a myelogram; however, his report neglected to address the fact that this procedure placed plaintiff at high risk for a life-threatening allergic reaction. We cannot conclude that plaintiff was "malingering" merely by deciding against this procedure, espe-

cially in light of his otherwise consistent efforts at recovery. The record indicates plaintiff underwent regular examinations, submitted to all other tests ordered by his physicians, and performed with satisfactory or high effort in his physical therapy. Finally, the vast majority of medical evidence indicates that plaintiff's condition indeed resulted from duty-related accidents. The only evidence to the contrary was Motto's statement that his condition could have been occasioned by the natural aging process. Motto added, however, that in light of plaintiff's young age and the extent of deterioration, it was also likely that the July 23, 1991, accident led to his present state of ill-being.

For the foregoing reasons, we find the Board's determination to have been against the manifest weight of the evidence, and reverse and remand this action to the Board with instructions to award plaintiff the duty-disability benefits to which he was entitled. In light of our decision, we do not reach plaintiff's additional contentions that he was deprived of a fair hearing and that the Board improperly denied his claim for ordinary disability benefits.

Reversed and remanded with directions.

JOHNSON and CAHILL, JJ., concur.