SECOND DIVISION 

NOVEMBER 28, 2000

1-99-2651

CLIFTON THIGPEN,
 
 ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County

) 

v. ) No. 98 CH 17882

) 

RETIREMENT BOARD OF FIREMEN'S ) The Honorable 

ANNUITY AND BENEFIT FUND ) Dorothy K. Kinnaird,

OF CHICAGO, ) Judge Presiding.

) 

Defendant-Appellant. )
 

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff, Clifton Thigpen, sought administrative relief from a decision of the Retirement Board of Firemen's Annuity and Benefit Fund of Chicago (the Board) denying his application for duty disability benefits under the Illinois Pension Code (40 ILCS 5/6-101 
et
 
seq
. (West 1996)).  The circuit court reversed the Board's decision and the Board now appeals from the judgment.  The issue presented for review is whether the trial court erred in finding that the decision of the Board denying Thigpen's application for duty disability benefits was against the manifest weight of the evidence.  

We affirm.

BACKGROUND

Clifton Thigpen became a firefighter for the Chicago fire department in October of 1978.  On February 22, 1995, he slipped 
and fell from the sixth rung of a wooden ladder (approximately four to six feet) while polishing a brass pole located at his firehouse.  Polishing the brass pole was one of his assigned duties as a firefighter.  He landed on his back and right elbow.  His fall was witnessed by Lieutenant Donald Pugh and firefighter Donald Robinson, the firefighter holding the ladder.  Following the fall, Thigpen was transported via ambulance to Little Company of Mary Hospital for medical treatment.  According to the emergency room physician's report, "moderately severe pain to olecranon process of the right elbow" was noted and "moderate right paralumbar tenderness" was found in his back.  The report also indicated that he refused pain medication at that time.  Thigpen was released the same day with pain medication and was instructed to return if his pain worsened.

Shortly after Thigpen's release, he was evaluated by Dr. Steven Mather, his primary care physician, of the Parkview Orthopaedic Group, S.C.  Dr. Mather's March 16, 1995, letter to Dr. Hugh Russell, medical director of the Chicago fire department, provided:  "On physical examination [Thigpen] is quite tender in the lumbosacral junction. *** We will get him into physical therapy for a quicker return to work. *** At the next visit I think he should be able to return to work."  In a letter dated April 20, 1995, Dr. Mather indicated to Dr. Russell: 

"We will get an epidural steroid and follow this with a 2nd one 2 weeks later.  We will see him back 2 weeks after his epidural steroids and will continue the therapy for now.  He is currently off work until further notice."  

After a June of 1995 examination, Dr. Mather recommended  two epidural steroid injections two weeks apart for Thigpen.  In July of 1995, Dr. Mather wrote to Dr. Russell:  "His back is feeling better. *** We will get him into physical therapy for strengthening and conditioning and see him back in 4 weeks at which time our goal would be to return him to unrestricted duty."   Also in July of 1995, Thigpen participated in a functional capacity evaluation (FCE) conducted by physical therapist Kathy Ruggio of the CAREMARK Center for Industrial Rehabilitation.  Ruggio's report stated:

   "A firefighter is considered to be in the Very Heavy work category which is a lift of over 100# on an occasional basis.  It is apparent that the client is unable to perform his pre-injury job demands at this time.

   ***

   It appears that the client would benefit from a work hardening program in order to increase functional capabilities to those of his job demands.  It is recommended that the client participate in a 4-6 week program with emphasis on general reconditioning, low back strengthening, and progressive functional tasks."

In a letter written by Dr. Mather in August 1995, he indicated to Dr. Russell that Thigpen's back was "starting to bother him again" and recommended "facet injections at L5-S1" and another visit from Thigpen two weeks after the injections.  In September of 1995, Dr. Mather noted about Thigpen's progress: 

"Persistent complaints of low back pain, without objective findings.  We will try going back to work as of tomorrow night, 9-21-95.  If his symptoms change, he will see us back."  

Following the February 22, 1995, accident, Thigpen was on medical "lay up" until October of 1995.  The lay up period in 1995 was not Thigpen's first lay up experience.  He had been on fire department lay up from December of 1979 to June of 1980 for a nonduty car accident in which he sustained injuries to his back.  In October of 1982, he was on lay up for another non duty car accident that also caused back injuries.  In 1984, he was, again, laid up for 36 days for treatment of a nonduty acute lumbar radiculopathy/cervical strain.  

In October of 1995, at his request, Thigpen returned to work as a fire inspector, not as a firefighter.  He remained a fire inspector until April of 1997 when, according to him, his back pain increased to the point that he could no longer continue to work.  In April of 1997, he was placed on lay up with the applicable benefits. 

Dr. Robert Gettleman prescribed physical therapy, epidural shots, and facet shots for Thigpen's back pain between July and September of 1997.  In October of 1997, Dr. Gettleman ordered a bone scan of Thigpen's back and "if they are negative he may then return to his usual occupational duties."  The record indicates that "the three phases of the bone scan were negative." 

In February of 1998, Thigpen made an application for duty disability benefits, stating that he was "no longer physically capable of performing [his] duties as a firefighter due to the accident and injury of February 22, 1995."  Thigpen has not received any salary or benefits since February of 1998.  

The Board began its hearings on Thigpen's application for duty disability benefits in March of 1998.  While his application for duty disability benefits was pending, Thigpen applied for ordinary disability benefits, under article 6, section 152, of the Illinois Pension Code, in January of 1999.  40 ILCS 5/6-152 (West 1996).  The record indicates that the Board refused to hear his application for ordinary benefits because the matter regarding duty disability benefits was before the circuit court for review.  

The exhibits presented to the Board during Thigpen's duty disability hearing included: Thigpen's February 22, 1995, emergency room report; the Chicago fire department's report of Thigpen's injury; Thigpen's duty disability benefit application and supporting statement; Thigpen's lay up summary; Dr. Mather's diagnostic evaluations and letters to the Chicago fire department’s medical director; Dr. Ike Arene's letter to the Board; Dr. Gettleman's letters to the Board's physician and consultant, Dr. George Motto and Dr. Arene; Dr. Motto's letter to the Board; Dr. Motto's curriculum vitae; reports regarding Thigpen's nonduty injuries and hospitalizations; medical reports regarding Thigpen's epidural injections, bone scan, and X-rays; Thigpen's work capacities assessment; three FCE reports; and the testimony of Pugh, Robinson, Rios, Dr. Motto, and Thigpen. 

The record indicates that when a firefighter requests duty disability benefits, the Board physician and consultant examines the applicant.  Dr. Motto examined Thigpen in March of 1998.  Dr. Motto's March 1998 letter to the Board indicated:

   "The applicant was an alert cooperative stated age appearing man who walked with a brace, very stiff spined and hesitantly, very slowly with a very steady gait.  He had marked difficulty both getting into and getting out of a chair and was in obvious physical discomfort performing those activities.  Range of motion of the back was markedly decreased with spasm of the muscles.  Comment: Clifton Thigpen is a 48 year old man who relates that since February 22, 1995, when he fell flat on his back, injuring his back, he has had progressive difficulties with pain in his back and radiation to his legs and he has been unable to work."

At the request of Thigpen's attorney, Dr. Gettleman prepared a letter addressed to Dr. Motto in April 1998, which noted:

   "As far as whether or not Mr. Thigpen's problems relate directly to his injury, I do not feel that I can state this to a reasonable degree of medical certainty.  Regarding his ability to return to work, in cases such as this I generally have the patient undergo a functional capacity evaluation and tend to abide by that report."

Dr. Arene wrote a letter to Dr. Motto in April of 1998 stating: 

"Upon review of [Thigpen's] chart, there is no evidence that his medical condition is the result of any trauma other than the one he suffered on February 22, 1995.  *** Mr. Thigpen cannot perform as a [
sic
] active firefighter anytime in the future." 

Dr. Motto requested that Thigpen participate in a FCE in order to assess Thigpen’s physical capabilities and ability to return to work as a firefighter.  A FCE was conducted by occupational therapist Phil Rios in June of 1998.  Rios' report indicated:

   "No recommendations can be made at this time due to positive testing for non-exertion of maximum effort and inappropriate illness behavior.  However, due to history of physical therapy and pharmacological interventions without noted progress over the past 3½ years and the findings of this evaluation, Mr. Thigpen's functional capabilities and pain behaviors are highly suspect." 

Another FCE was conducted by John Comerouski, a physical therapist, in September of 1998 because as Dr. Motto indicated, there was a problem with the initial FCE "as far as consistency of performance."  Comerouski's evaluation indicated that Thigpen 

"demonstrated work tolerance at the light physical demand level without frequent lifting tolerance.  This falls well short of the job requirements needed to perform the job of a firefighter for the Chicago Fire department."  Comerouski concluded that Thigpen's "return to work as a firefighter is not a possibility at this time."   

During the hearing before the Board, the following dialogue took place between Dr. Motto and the Board's attorney:

   "Q. Are you familiar with the duties required of a member of the Chicago Fire department?

   A. Yes.

   Q. Do you have an opinion to a reasonable degree of medical certainty whether Mr. Thigpen can perform those duties?

   A. Yes.

   Q. What's your opinion?

   A. I believe he cannot.

     Q. What is the basis of your opinion?

   A. Well, for one thing my observation of the applicant since March of 1998, including my initial observation.  The consistency of his symptoms through the medical record from 1995.  Some of the testimony of the witnesses this morning. *** I believe at this point he cannot fight fires.

* * *

   *** [T]he physical cause I think is due to problems with his back and nerve impingement with radiculopathy causing chronic back pain.  As to the injury cause, I can only say that-- I can't say for certain but chronologically or according to testimony the current disability stems from the September 22nd-- I believe it's 1995.

   Q. February 22, 1995.  What is the basis of your opinion?

   A. Well, although it is true that the applicant does have a history of problems, the witnesses and the medical record don't attest to any problems for several years prior to 1995.  And, since February 22, 1995, the records is [
sic
] replete with physicians entries, treatment plans, physical therapy, diagnostic procedure, complaints of pain, that weren't present before." 

Also at the Board hearing, Thigpen testified about the 1995 fall and about his physical capacity prior to the fall.  He worked as a firefighter without physical disability for 11 years continuously before he fell from the firehouse ladder in 1995.  The Board asked him questions about the injuries to his back in 1979 and 1982 and the opinions that Dr. Roberts and Dr. Henry issued in 1982 relative to the 1982 back injury.  Thigpen also introduced evidence as to his medical treatment following the 1995 fall. 

The Board denied Thigpen's application for duty disability benefits and Thigpen appealed.  The Cook County circuit court reversed the Board's decision.  The Board appeals from the decision of the circuit court.  We affirm for the following reasons.

ANALYSIS 

It is the responsibility of the administrative agency to weigh the evidence, determine the credibility of witnesses and resolve conflicts in testimony.  
Nichols v. Department of Employment Security
, 218 Ill. App. 3d 803, 809, 578 N.E.2d 1121 (1991).  On administrative review, a circuit court inquires only as to whether the findings are against the manifest weight of the evidence; its purpose is not to resolve factual inconsistencies, nor to re-weigh the evidence to determine where the preponderance of the evidence lies.  
Ruther v. Hillard
, 306 Ill. App. 3d 997, 1002, 715 N.E.2d 772 (1999). 
 

In 
Abrahamson v. Illinois Department of Professional Regulation
,
 
153 Ill. 2d 76, 606 N.E.2d 1111 (1992), the Supreme Court of Illinois confirmed that "[a]n administrative agency['s] decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident."  
Abrahamson
,
 
153 Ill. 2d at 88.  The court must not substitute its judgment for that of the administrative agency; rather, if the record contains evidence to support the agency's findings, its decision should be affirmed.  
Abrahamson
,
 153 Ill. 2d at 88.

The Administrative Review Law provides that appellate court review extends to all questions of law and fact presented by the entire record.  735 ILCS 5/3-101 
et
 
seq
 (West 1998).  Where the question involved is one of law, the proper standard of review is 
de
 
novo
.  
Midwest Central Education Ass'n v. Illinois Educational Labor Relations Board
, 277 Ill. App. 3d 440, 444, 660 N.E.2d 151 (1995).
  The appellate court reviews the administrative decision rather than the circuit court's decision.  
Calabrese v. Chicago Park District
, 294 Ill. App. 3d 1055, 1065, 691 N.E.2d 850 (1998).

It is well established that the provisions governing police and firemen's pensions must be liberally construed in favor of the applicant.  
Sullivan v. Retirement Board of Firemen's Annuity & Benefit Fund
, 267 Ill. App. 3d 965, 970-71, 642 N.E.2d 727 (1994).  In order for an active fireman to be entitled to duty disability benefits, he must establish:  (1) that he is disabled; and (2) that his disability was caused by an injury incurred in or resulting from an act of duty.  40 ILCS 5/6-151 (West 1996).  

The Illinois Pension Code define's "disability" as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the fire service."  40 ILCS 5/6-112 (West 1996).  The Code defines an "act of duty" as:

   "Any act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person."  40 ILCS 5/6-110 (West 1996). 

When applying for benefits, the Code provides:

   "Proof of duty, occupational disease, or ordinary disability shall be furnished to the Board by at least one licensed and practicing physician appointed by the Board."  40 ILCS 5/6-153 (West 1996). 

Recently, the Illinois Appellate Court explained that "section 6-153 mandates that, before granting a disability benefit, the Board must receive proof of the claimant's disability from at least one physician appointed by the Board."  
Nowak v. Retirement Board of the Firemen's Annuity and Benefit Fund
, 315 Ill. App. 3d 403, 411-12, 733 N.E.2d 804 (2000).  

In its written letter to Thigpen denying his application for duty disability benefits, the Board stated:  "Based upon a review of all the evidence presented, after due deliberation and the Board being fully advised in the premises, the Board has denied your application for duty disability benefits."  Paragraphs 2 and 3 of the letter are as follows:

   "2.  On or about June 30, 1998, after the Applicant filed his Application for duty disability benefits, Phil Rios of HealthSouth performed a Functional Capacity Evaluation of the Applicant.  The Applicant tested positive in 6 out of 7 cognitive distraction tests that are indicative of inappropriate illness behavior.  The Applicant showed 'non-

exertion of maximum effort'.  Rios stated that the Applicant's 'functional capabilities and pain behaviors are highly suspect'.

   3.  On September 29, 1998, John Comerouski of HealthSouth performed another Functional Capacity Evaluation on the Applicant.  
Although
 the Applicant tested out at the 'light physical' demand level and was deemed 
unfit to return to work as a firefighter
, and 
although
 Comerouski found that the Applicant 'was 
negative for inappropriate illness behaviors
 on the Ransford Pain Drawing', the Applicant was positive with a high score on the Inappropriate Symptoms Questionnaire.  The McGill Pain Questionnaire demonstrated an extremely high score which indicates possible symptom exaggeration.  The Applicant tested positive for 
one
 of the five Waddell factors which test symptom magnification."  (Emphasis added.)

Paragraphs 4, 5, and 6 of the Board's decision letter related to the Thigpen's history of nonduty accidents in 1979 and 1982 and the back problems presented at that time.  Paragraph 7 stated:

   "7.  In view of the foregoing, including but not limited to the matters referred to in paragraphs 2 and 3 above, and in view of the Applicant's demeanor during the hearings, the Applicant's testimony is not credible and the evidence before the Board fails to establish that the Applicant is disabled as the result of an act or acts of duty.  Moreover, the evidence fails to establish that the Applicant is disabled."

Although Thigpen was examined by the Board's physician and consultant, Dr. Motto, the Board's decision makes no reference to the opinion of Dr. Motto that Thigpen was unable to perform his duties as a firefighter and that the cause of his disability was the fall at the firehouse on February 22, 1995.  
The Board's decision focused on the June 1998 FCE and Rios' comment that Thigpen's performance on the FCE was "highly suspect," Thigpen's testimony about his injury in the 1995 fall, Thigpen's testimony about his injuries in the 1979 and 1982 accidents, and two 1982 doctors' opinions relative to the 1982 injury.  

While it is true that Thigpen's results were "positive with a high score on the Inappropriate Symptoms Questionnaire" and "the McGill Pain Questionnaire also demonstrated an extremely high score which can indicate symptom exaggeration" during the FCE conducted by occupational therapist Rios in June of 1998,  Thigpen's results were actually negative for inappropriate illness behaviors on the Ransford Pain Drawing, also conducted during the June 1998 FCE.  Significantly, however, the results of the June 1998 FCE were inconclusive.

The Board also discounted the September 1998 FCE conducted by Comerouski.  The September 1998 FCE report provided:  "Frequent physical and verbal pain behaviors were present which appeared dramatic at times.  Mr. Thigpen was able to pass all validity and behavioral tests."  The evaluator of the September of 1998 FCE also commented:  "According to King and Berryhill in 
Work
 (1991), an individual must pass at least four out of five tests to be considered having given maximum effort.  Mr. Thigpen passed four out of five tests, denoting a maximum effort."  

The Board misconstrued the isolated positive result on the Waddell test for overreaction from the FCE conducted by Comerouski in September of 1998.  Comerouski clearly explained that "[i]solated positive signs are ignored.  The patient scored positive in 1 category only.  This was the category of overreaction." 

None of the doctors and none of the witnesses have testified that Thigpen was 
not
 disabled as a result of the February 22, 1995, fall.  There was no affirmative claim even by Rios that Thigpen was not disabled.  Rios' evaluation was not evidence that was probative either one way or the other relative to Thigpen's disability.  The FCE conducted by Comerouski in September of 1998 provided evidence that Thigpen was disabled.  Dr. Motto explained that the difference between these two FCEs "has to do with an observer.  *** What is done and how it is done."  

Additionally, two eye witnesses, Pugh and Robinson, corroborated Thigpen's fall from the ladder at the firehouse and his good condition and strength prior to the fall.  No evidence was heard that would support a conclusion that the disability that Dr. Motto found was caused by either the 1979 and/or the 1982 injuries.

Dr. Motto is the Board's own appointed physician and consultant.  The record establishes that, as a basis for his opinion, he heard the testimony of witnesses at the Board hearings, had all the FCE results before him for consideration, and personally examined Thigpen. 

The Board in the instant case has inferred that Thigpen's back problems stem from his earlier "nonduty" back injuries, not the February 1995 fall.  However, evidence of a preexisting physical disability does not bar a duty disability pension where it can be shown that a claimant's disability was caused by an act of duty which aggravated his preexisting condition.  
Olson v. City of Wheaton Police Pension Board
, 153 Ill. App. 3d 595, 598, 505 N.E.2d 1387 (1987).  A plaintiff need not prove that an injury received on duty was the sole cause of his disability; the injury need only have contributed to the disability.  
Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund
, 263 Ill. App. 3d 539, 543, 640 N.E.2d 1246 (1994).  Dr. Motto testified in the instant case that "an injury like [Thigpen's fall] could accelerate back problems."  Assuming 
arguendo
 that Thigpen's fall may not have been the sole cause of his physical difficulties, such does not bar his claim.

A case similar to the one at hand is 
Sullivan v. Retirement Board of Firemen's Annuity & Benefit Fund
, 267 Ill. App. 3d 965, 642 N.E.2d 727 (1994).  In 
Sullivan
, the issue upon appeal was whether the decision of the Board to deny a paramedic's duty disability benefits was supported by the evidence in the record.  A paramedic who had a history of duty-related back injuries suffered a back injury while attempting to lift a 400-pound patient on a stretcher.  
Sullivan
, 267 Ill. App. 3d at 966.  The applicant was examined by a doctor who recommended testing for further analysis, placed him on a physical therapy schedule, including treatment with muscle relaxants and steroids, and ordered him to remain off of work.  
Sullivan
, 267 Ill. App. 3d at 967.  The 
Sullivan
 court held that the Board's decision to deny the applicant's application for benefits was against the manifest weight of the evidence.  
Sullivan
, 267 Ill. App. 3d at 972.  The court relied on the testimony of the Board's physician and consultant that Sullivan was unable to perform as a paramedic, the fact that Sullivan submitted to all tests ordered by his physicians, that Sullivan performed with satisfactory effort in his physical therapy, and that the vast majority of medical evidence indicated that Sullivan's condition indeed resulted from duty-related accidents.  
Sullivan
, 267 Ill. App. 3d at 972.

 Another similar case is 
Zien v. Retirement Board of the Firemens' Annuity & Benefit Fund
, 236 Ill. App. 3d 499, 603 N.E.2d 777 (1992).  In 
Zien
, a paramedic who fell on a set of stairs while transporting a patient on a stretcher was denied duty-related disability benefits.  Zien
 was on leave for approximately one month before returning to work.  Zien was soon off of work, again, due to "unbearable pain."  Approximately seven months later, the paramedic returned to work, only to be on medical leave eight months later due to back problems.  Work capacity evaluations indicated that he was unable to lift the amount of weight required to work as a paramedic.  
Zien
, 236 Ill. App. 3d at 504.  However, the Board in 
Zien
, as did the Board in the instant case, believed that the applicant’s back pain was feigned or exaggerated.  
Zien
, 236 Ill. App. 3d at 507-08.  The Board physician and consultant testified that the applicant's injury was caused by the on-duty fall and that he could no longer work as a paramedic.  
Zien
, 236 Ill. App. 3d at 506-07.  In 
Zien
, the appellate court found that the Board's decision was against the manifest weight of the evidence and that Zien should have been awarded duty-related disability benefits.  
Zien
, 236 Ill. App. 3d at 508.

The Board in the instant case places reliance on 
Rhoads v. Board of Trustees of the City of Calumet City Policemen's Pension Fund
, 293 Ill. App. 3d 1070, 689 N.E.2d 266 (1997).  However, 
Rhoads
 is distinguishable.  In 
Rhoads
, the Board disputed the cause of the injury, finding the claimant's explanation not credible.  The Board in 
Rhoads
 also considered various factors before denying the claimant's application for benefits, including:  his attempt to prevent the Board from obtaining certain employment records; his discussion of testimony with a prospective witness prior to that person testifying; the fact that his testimony was contradicted by other witnesses; and his actions after the alleged injury were deemed inconsistent with an on-duty incident.  
Rhoads
, 293 Ill. App. 3d at 1076.  Additionally, the claimant in 
Rhoads
 did not produce any record of medical treatment, and the report of the causal event was not corroborated.  
Rhoads
, 293 Ill. App. 3d at 1076.

While an administrative agency's findings of fact are considered 
prima
 
facie
 correct, they must still be based on the evidence, and the agency as fact finder cannot simply disregard the testimony of an unimpeached witness where the testimony is uncontradicted and is not inherently improbable.  
Trahraeg Holding Corp. v. Property Tax Appeal Board
, 204 Ill. App. 3d 41, 44, 561 N.E.2d 1298 (1990).

For the foregoing reasons, although the Board referred to Thigpen's demeanor during the hearing and found that his testimony was not credible, we hold that the Board's finding that the evidence "fails to establish that the Applicant is disabled as a result of an act or acts of duty" and that "the evidence fails to establish that the Applicant is disabled" is against the manifest weight of the evidence.  

Accordingly, the decision of the circuit court is affirmed.

Affirmed.

CAHILL, P.J., concurs.

McBRIDE, J., dissents.

JUSTICE McBRIDE dissenting:

I respectfully dissent for two reasons.  First, I believe the Board's finding that Thigpen had not established he was "disabled as a result of an act or acts of duty" was not against the manifest weight of the evidence.

As the majority points out a judgment is against the manifest weight of the evidence when it appears from the record than an opposite conclusion is clearly evident.  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992).  In order to make a finding, however, that an opposite conclusion is clearly evident, we as a reviewing court: 

"[m]ust conclude that all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all reasonable inferences in support of the finding, would agree that the finding is erroneous***. It is not sufficient that there are mere conflicts in the testimony or that an opposite conclusion might be reasonable, since the weight of the evidence and the credibility of the witnesses are within the province of the agency, there need be only some competent evidence in the record to support its findings."  
Evert
, 180 Ill. App. 3d 656, 660, 536 N.E.2d 143 (1989).

In my opinion there was competent evidence in the record which supports the Board's finding that Thigpen had not established he was disabled as a result of an act or acts of duty.

Although Dr. Motto did testify to a reasonable degree of medical certainty that Thigpen could not perform his duties as a firefighter, Dr. Motto's testimony also indicated he could not "say for certain" that Thigpen's disability stemmed from the February 1995 fall.  He did say that "chronologically or according to the testimony" of witnesses he believed the "current disability stems from the September 22
nd
 - I believe it's 1995."

Dr. Motto's letter to the Board dated March 25, 1998, does not suggest that he was of the opinion that Thigpen was disabled as a result of the February 25, 1995 fall.  The letter does reflect that "Thigpen considers himself 'totally disabled.'"  Noteworthy is the fact that this letter was written after Dr. Motto conducted a medical examination of Thigpen.  

At the hearing before the Board, Dr. Motto also conceded that Thigpen had a history of back problems that predated the 1995 incident.  He also indicated, however, that all of Thigpen's recent problems seem to postdate the 1995 fall.

Dr. Motto's testimony and letter could be interpreted as equivocal and thus support the Board's finding that Thigpen had not established he was disabled as a result of an act of duty. 

Under 
Nowak v. Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago
, 315 Ill. App. 3d 403, 733 N.E.2d 804 (2000), the majority explains that the Board must receive proof of the claimant's disability from at least one physician appointed by the Board.  
Nowak
, 315 Ill. App. 3d at 412.  Looking at Dr. Motto's testimony in its entirety, I believe there is some question whether the Board received proof of Thigpen's duty disability from at least one physician appointed by the Board. 
Nowak
, 315 Ill. App. 3d at 412; 40 ILCS 5/6-153 (West 1996).

There was also other evidence in the record which supports the Board's finding that Thigpen failed to establish he was disabled as a result of an act of duty.  Some of that evidence included the initial emergency room x-rays taken the day of Thigpen's February 1995 fall.  Those reports were negative for any fracture or destructive bony process.  While there was evidence of degenerative changes in the spine at that time, there was no evidence of a fracture to the lumbar spine.  

The FCE report from June 1998 indicated that Phil Rios, the examiner, could make no recommendation regarding Thigpen's functional capacity at that time due to Thigpen's "positive testing for non-exertion of maximum effort and inappropriate illness behavior."

Dr. Robert Gettleman's letter of April 8, 1998, reflects that as of the 20
th
 of October 1997, although Thigpen was complaining of low back pain which occasionally radiated down both legs, upon examination the doctor "found him to have no difficulty with straight leg raising to 90 degrees on either side.  He had normal strength and sensation."  Dr. Gettleman who examined and treated Thigpen a number of times after the February 1995 fall could not state to a reasonable degree of medical certainty that Thigpen's problems related to his 1995 fall from the ladder. Thigpen's complaints of low back pain which radiated down his legs had been documented for several years before 1995, although objective findings supporting those complaints were absent from some of those reports.

Additionally, a three phase bone scan performed in October 1997 was negative for a fracture or herniated disc.  Thigpen's sworn application for duty disability benefits indicated that he suffered from a herniated disc as a result of the February fall.  There was no medical testimony to support that portion of the sworn statement.  In fact, the medical evidence indicated the contrary, that Thigpen did not suffer from a herniated disc.  

The Board also found portions of Thigpen's testimony incredible.  That finding was also supported by the evidence.  Two separate functional capacity evaluations conducted in 1998 showed some symptom exaggeration by Thigpen.  Thigpen could recall some of his medical history but had a very limited recall of his prior injuries related to motor vehicle accidents. 

Thigpen had a history of back problems related to those non-

duty accidents long before 1995 which kept him off work for a considerable period of time.

His lay-up history included a 207-day absence from work because of a 1979 non-duty car accident.  In 1982, Thigpen was off 60 days because of back pain due to another non-duty motor vehicle accident.  In 1984, Thigpen was off 36 days for "acute lumbar radiculopathy and cervical strain" unrelated to duty. He was off work for over 200 days in 1984 for the above injury coupled with a 183-day absence for a non-duty related foot surgery. 

In 1980 after Thigpen's first automobile accident, Dr. Siqueira examined Thigpen for complaints of lower back pain and found no evidence of organic neurological disease.

Dr. Stephen Mather who treated Thigpen after the February 1995 fall concluded that Thigpen's complaints of low back pain were without objective findings.

There is no question that in an April 1998 letter Dr. Ike Arene was of the opinion that Thigpen's medical condition was the result of the trauma from the fall on February 22, 1995 and Thigpen could not perform the duties of a firefighter.  However, this letter was not the only evidence presented, as was pointed out above.   

The majority criticizes the Board because it makes no reference to Dr. Motto's opinion.  The majority notes that the Board's decision narrowly focused on the June 1998 FCE, Rios' comment in that same FCE that Thigpen's performance was highly suspect and Thigpen's testimony about his prior injuries.  The majority then interprets those same FCE results as being negative for inappropriate illness behaviors.  The majority says the Board "discounted" the 1998 FCE conducted by Comerowski.  The majority suggests that the Board has somehow improperly "inferred" Thigpen's back problems stem from his earlier non-duty back injuries.  Based upon all of the evidence presented the Board could reasonably infer this, in addition to inferring that Thigpen was not disabled as a result of an act of duty.  

These findings made by the majority in my opinion indicate an impermissible reweighing of the evidence and an independent determination of the credibility of the witnesses.  By reweighing the evidence and independently determining the credibility of the witnesses, I believe the majority and the circuit court below have substituted their judgment for that of the Board.  
Rhoads v Board of Trustees of the City of Calumet City Policemen's Pension Fund
, 293 Ill. App. 3d 1070, 1076, 678 N.E.2d 266 (1997).

The majority also says "none of the witnesses have testified that Thigpen was 
not
 disabled as a result of the February 22, 1995 fall."  I disagree with this comment for two reasons.  First, the burden rests upon the applicant to establish that he was disabled as a result of an act of duty, and; second, there was medical testimony in the record which could have been interpreted by the Board as demonstrating that Thigpen was not disabled as result of the February 22, 1995 fall.  
Evert
, 180 Ill. App. 3d at 661.   

The majority concludes that the Board cannot disregard the testimony of an unimpeached witness where the testimony is uncontradicted.  Had the Board disregarded all the credible, uncontradicted evidence in this case I would agree with this conclusion.  But that is not what occurred here.  Some of the Board members chose to disregard either Dr. Motto's testimony or Dr. Arene's opinion as it was their prerogative to do.  In addition, I believe Dr. Motto's testimony could be interpreted unfavorably for Thigpen on the question of whether he was disabled as a result of an act of duty.  Again, interpreting and weighing the testimony of witnesses is the Board's function, not ours.  Dr. Gettleman's letter clearly supports the Board's finding that Thigpen failed to establish his disability was the result of an act of duty.  Although one may reach an opposite conclusion from the conflicting evidence presented in this case,  I cannot say an opposite conclusion is clearly evident. 

I also dissent because I do not believe the Board is required to accept medical evidence when there is other evidence in the record which supports the finding that the pension applicant is not disabled as a result of an act of duty.  The Pension Code provides that in addition to receiving proof of duty disability from one physician appointed by the Board, the Board may require other evidence of disability.  40 ILCS 5/6-153 (West 1996).  In my opinion, this section allows the Board to consider evidence other than medical testimony.  Here, even if Dr. Motto's testimony could be interpreted only as the majority holds, the Board is not required to accept it, because it has the authority to "require other evidence."  40 ILCS 5/6-153 (West 1996).  

In addition although 
Nowak
 did not specifically address this particular provision of section 6-153, it did note that "[t]he Board would not be bound to find a claimant disabled simply because the Board-appointed doctor so found.  
Nowak
, 315 Ill. App. 3d at 412.   Because there was some competent evidence in the record which supports the Board's finding, I would reverse the decision of the trial court and affirm the decision of the Board.

For all the above reasons, I respectfully dissent.