P. v. Stevenson 

No. 2--02--0242

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

PETER M. HMELYAR, ) Appeal from the Circuit Court

) of Du Page County.

Plaintiff-Appellant, )

)

v. ) No. 01--MR--709

)

PHOENIX CONTROLS and THE BOARD )

OF REVIEW OF THE DEPARTMENT )

OF EMPLOYMENT SECURITY,  ) Honorable

) Edward R. Duncan, Jr.,

Defendants-Appellees. ) Judge, Presiding.

_________________________________________________________________

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

Plaintiff, Peter M. Hmelyar, appeals from an order of the circuit court of Du Page County on administrative review, affirming a decision by defendant, the Board of Review of the Illinois Department of Employment Security (the Board), that denied plaintiff unemployment benefits for December 3, 2000, through December 16, 2000.  The Board found that, during this period, plaintiff was not "unemployed" under section 239 of the Unemployment Insurance Act (the Act) (820 ILCS 405/239 (West 2000)).  On appeal, plaintiff contends that this finding is against the manifest weight of the evidence.  We reverse and remand.

On November 9, 2000, defendant Phoenix Controls terminated plaintiff's employment.  In an "Employment Separation and Release" (severance agreement) dated November 9, 2000, Phoenix Controls informed plaintiff that, from November 22, 2000, through July 12, 2001, he would receive 34 weekly severance payments of $2,295 each and that his health insurance plan would continue in force.

By a letter dated November 15, 2000, Gordon Sharp, president of MyIndoorAir, Incorporated (MyIndoorAir), offered plaintiff a job as its vice president of sales.  The letter, which plaintiff signed November 15, 2000, set out the terms of employment.  The terms included:

"1.  Compensation including three components:  salary, two contingent bonuses, and incentive stock options (ISO).

* Annual base salary of $121,000.  Note that from November 13th, 2000 through July 9th, 2001 this salary and all health and dental benefits will be paid by Phoenix Controls.

* * *

* 50,000 Incentive Stock Options, with a current purchase price of $1.75/share, and a four-year vesting period (pending Board of Director approval).

2.  From November 13th, 2000, through July 13th, 2001 your health and dental benefits will continue to be provided by Phoenix Controls.  Additionally you are covered with all of your other Phoenix Controls benefits until the end of November.  Consequently, from December 1st and forward you will be eligible for all of the following Group Insurance Benefits except health and dental coverage."

The "Group Insurance Benefits" included life, short-term disability, and long-term disability insurance.  The value of any benefits was tied to plaintiff's salary.

Plaintiff filed a claim with the Illinois Department of Employment Security for unemployment benefits for December 3 through 16, 2000.  The claim included a "work search record" for the week ending December 15, 2000.  Phoenix Controls protested the claim.  The case went to a hearing before a referee on January 24, 2001.  Plaintiff and Jamie Hopmayer, Phoenix Controls' human resources manager, testified by telephone.  At the time of the hearing, the severance agreement had not been filed; thus, the referee had not reviewed it.

Plaintiff testified that his last day of employment for Phoenix Controls was November 9, 2000.  At that time, plaintiff's weekly salary was $2,295.  Although the letter from MyIndoorAir stated that plaintiff's "annual base salary" would be paid from November 13, 2000, through July 9, 2001, that "salary" was reflected as part of his severance package.  Plaintiff believed that, if he stopped working for MyIndoorAir, he would still receive his severance pay from Phoenix Controls.  Plaintiff was looking for other job opportunities, but he and Sharp had hoped that, as soon as MyIndoorAir obtained enough financing, plaintiff could begin to "draw *** money from the company."

Plaintiff further testified that Sharp had started Phoenix Controls but left approximately two years before the hearing to form MyIndoorAir.  At one time, MyIndoorAir was a unit of Phoenix Controls and had leased office space from Phoenix Controls, but since January 2000 the companies had been "separate business entities."

Since mid-November 2000, plaintiff had assisted MyIndoorAir with marketing research and developing a business plan.  In the week beginning December 3, 2000, plaintiff devoted approximately 16 hours to this work; for the week beginning December 10, 2000, the figure was 20 hours.  To date, plaintiff had received no "W-2 wages" from MyIndoorAir.  His contract provided for several contingent bonuses, but none had been paid because the contingencies relating to raising capital had not been fulfilled.  Also, the stock options would not begin to vest until November 15, 2001, and would have value only if the company received "venture capital funding."

Hopmayer testified that plaintiff's "base salary" under the MyIndoorAir contract was actually part of his severance package from Phoenix Controls.  Asked whether the MyIndoorAir contract was "later modified" to conform to the severance agreement, Hopmayer responded, "That has nothing to do with Phoenix Controls.  *** [O]bviously, one company has no control over what another company does with Pete Hmelyar.  *** [T]hat document was not drafted in concert with Phoenix Controls at all."

The referee found that plaintiff was not an "unemployed individual" during the period at issue and specifically that plaintiff's stock options had some value and that plaintiff received them when he started with MyIndoorAir.  Also, while not expressly finding that the payments from Phoenix Controls were "wages," the referee doubted that they were severance pay, as the MyIndoorAir contract called them "salary."

Plaintiff appealed to the Board and supplied it a copy of the severance agreement.  The Board affirmed the referee.  In holding that plaintiff had not been "unemployed," the Board reasoned:

"While the claimant states he has received no remuneration for his services, clearly the stock options he has received have a value of at least $1.75/share.  Whether or not the stock options have vested, the claimant, under his employment contract, has been given the rights to the stock options.  Also, as remuneration for his services, the new employer is providing group insurance benefits for the claimant.  While the claimant may not be receiving base salary during the period under review, the claimant has received remuneration or wages for the services he performed for his new employer."

On administrative review, the trial court affirmed the Board's decision.  Plaintiff timely appealed.  He contends that the Board's decision must be reversed outright because he was an "unemployed individual" during the period at issue.  Plaintiff argues specifically that neither the stock options nor the group insurance benefits were "wages" as defined in the Act.  See 820 ILCS 405/234, 235 (West 2000).  Plaintiff argues in the alternative that, even if he did receive wages, the Board did not determine their value and thus did not decide whether either week's wages were less than his weekly benefit amount.  Therefore, the Board could not decide whether plaintiff was "unemployed" and the cause must be remanded so the Board may do so.

Phoenix Controls has not filed a brief on appeal.  The Board  argues that its finding that plaintiff was not unemployed is supported by the evidence and that its decision may be affirmed on other grounds on which its written order did not rely.

Our standard of review for a final administrative decision is governed by the Administrative Review Law (735 ILCS 5/3--101 
et seq.
 (West 2000)).  Under the Administrative Review Law, our review encompasses all questions of law and fact presented by the entire record.  735 ILCS 5/3--110 (West 2000); 
Bridgestone/Firestone, Inc. v. Aldridge
, 179 Ill. 2d 141, 148 (1997).  Our role is to review the administrative decision, not the trial court's determination.  
Thigpen v. Retirement Board of Firemen's Annuity & Benefit Fund
, 317 Ill. App. 3d 1010, 1017 (2000).

In examining an administrative agency's factual findings, we are limited to ascertaining whether such findings of fact are against the manifest weight of the evidence.  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 204 (1998), citing 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88 (1992).  An agency's findings on a question of law are reviewed 
de novo
.  
City of Belvidere
, 181 Ill. 2d at 205; 
White v. City of Aurora
, 323 Ill. App. 3d 733, 735 (2001).

Section 239 of the Act provides in relevant part:

" 'Unemployed individual.'  An individual shall be deemed unemployed in any week with respect to which no wages are payable to him and during which he performs no services or 
in any week of less than full-time work if the wages payable to him with respect to such week are less than his weekly benefit amount
."  (Emphasis added.)  820 ILCS 405/239 (West 2000).

Therefore, plaintiff was "unemployed" during a given week of less than full-time work if, during that week, his wages were less than his benefit amount.  See 820 ILCS 405/239 (West 2000).  If, as plaintiff contends, he received no wages during the period at issue, then his wages were less than his benefit amount and he was unemployed.

"Wages" are "every form of remuneration for personal services, including salaries, commissions, bonuses, and the reasonable money value of all remuneration in any medium other than cash."  820 ILCS 405/234 (West 2000).  However, "wages" do not include any payment made to or on behalf of an individual "under a plan or system established by an employer which makes provision generally for individuals performing services for him ***, on account of (1) sickness or accident disability ***, or (2) medical or hospitalization expenses in connection with sickness or accident disability, or (3) death."  820 ILCS 405/235(B) (West 2000).

The Board held that, between December 3 and 16, 2000, plaintiff received wages in the forms of group insurance benefits and stock options.  However, we agree with plaintiff that neither the group benefits nor the stock options were wages.

The Board's conclusion that the group insurance benefits were wages is legally erroneous because, as the Board now concedes, section 235(B) explicitly excludes life insurance and disability insurance from "wages."  The Board's conclusion is also factually against the manifest weight of the evidence because, under the contract, any benefits were tied to plaintiff's salary, and plaintiff's salary was zero.

The stock options present a more complicated issue.  However, we agree with plaintiff that the options cannot be considered "remuneration."  A stock option is the right to buy a share or shares of stock at a specified price or within a specified period.  Black's Law Dictionary 1431 (7th ed. 1999); see also 
International Business Machines Corp. v. Bajorek
, 191 F.3d 1033, 1039 (9th Cir. 1999).  Incentive stock options are options that satisfy the requirements of section 422 of the Internal Revenue Code of 1986.  26 U.S.C.A. §422 (West 2002).

Although our research has uncovered no Illinois case law addressing whether and when stock options are "wages" under the Act, the treatment of stock options in other contexts is instructive.  In Illinois marriage dissolution cases, unvested stock options have been treated as marital property on the basis that the options create a contractual right in the employee who holds them.  See 
In re Marriage of Peters
, 326 Ill. App. 3d 364, 369 (2001); see also 750 ILCS 5/503(b)(3) (West Supp. 2001) (options acquired during marriage but before a judgment of dissolution or declaration of invalidity of marriage are presumed to be marital property, even if they have not vested and even if their value cannot be ascertained).  At dissolution, courts must allocate stock options between the parties, even though the options' value may be unascertainable and the actual property division may occur at a later date.  750 ILCS 5/503(b)(3) (West Supp.  2001).

Under proposed Treasury Regulations, federal unemployment taxes will be assessed when incentive stock options are exercised and not upon their grant.  66 Fed. Reg. 57023 (November 14, 2001).  Thus, for purposes of funding the unemployment compensation system, the exercise, not the grant, of the option triggers a tax liability.  Similarly, for certain state law purposes, the exercise, not the receipt, of a stock option is treated as a significant event.  See, 
e.g.
, 
Marchlen v. Township of Mt. Lebanon
, 560 Pa. 453, 460-61, 746 A.2d 566, 570 (2000) ("the value of the stock option is speculative and not readily ascertainable until exercised. *** [T]he taxing authority must wait until the exercise of the stock option to compute the associated [earned income] tax liability"); 
Scott v. Workers' Compensation Appeal Board
, 814 A.2d 298, 300 (Pa. Commw. 2003) (because stock options cannot be valued until they are exercised, they are excludable as income in workers' compensation matters for purposes of determining a claimant's average weekly wage).

In 
Bajorek
, a statute made it unlawful for an employer to collect or receive from an employee any wages that the employer had already paid the employee.  The statute defined "wages" as " 'all amounts for labor performed by employees of every description ***.' "  
Bajorek
, 191 F.3d at 1039, quoting Cal. Lab. Code §200 (West 1989).  Despite this broad definition, the court held that the stock options, which apparently had vested, were not wages because they "are not 'amounts.'  They are not money at all," but only rights with no fixed or readily ascertainable value.  
Bajorek
, 191 F.3d at 1039.

Here, the contract gave plaintiff the right to purchase as many as 50,000 shares of MyIndoorAir stock at some later date for $1.75 per share.  However, plaintiffs' "compensation" was contingent in several respects.  As the contract and plaintiff's testimony establish, plaintiff's right to buy any stock did not commence vesting until one year from the date of the contract, well beyond the period at issue.  Second, even had the options vested, their 
value
 was uncertain.  Finally, the contract indicated that the option grant was contingent upon board of director approval.

We conclude that the unvested and unexercised stock options here do not constitute "wages" for purposes of the Act.  As the foregoing authority indicates, a stock option's value is speculative and unascertainable upon the option's grant.  Here, the value of any remuneration is critical because it determines whether  plaintiff is entitled to any benefits and their amount.  Where the value of any compensation is speculative and unascertainable, the compensation cannot constitute "wages" for purposes of the Act.  We further note that the grant was contingent upon board of director approval.  There is no indication that this contingency was met.  We thus conclude that the Board erred when it determined that the stock options were "wages."  Therefore, the Board's decision cannot be sustained on either basis given in its order.

However, the Board now contends that we can affirm because (1) plaintiff failed to prove that he was not employed less than full-time, and (2) plaintiff did not prove that his severance payments were not really salary.  The Board observes that plaintiff has the burden to prove that he is eligible for benefits (see 
Acevedo v. Department of Employment Security
, 324 Ill. App. 3d 768, 771 (2001)), and it asserts that he did not disprove either of these grounds for rejecting his claim.

The Board did not find either that plaintiff was employed full time or that his severance payments were really a form of salary.  The Board never held that plaintiff did not meet his burden of proof on these issues.  Because the evidence is at most conflicting, we decline to usurp the Board's fact-finding role in affirming its judgment.

The Board's first alternative argument is that plaintiff did not satisfy section 239 because he did not prove that either week was one of "less than full-time work."  820 ILCS 405/239 (West 2000).  However, it was undisputed that plaintiff worked no more than 20 hours either week and that he spent his time searching for work elsewhere.  Plaintiff was not working full time during the period in question; had the Board found otherwise, that finding would have been against the manifest weight of the evidence.

A regulation that the Board itself cites defines "full-time" work as "the number of hours or days a class of workers would work if the employing unit had all the business it could handle," customarily 40 hours per week.  56 Ill. Adm. Code §2920.1 (2001).  This definition is provided to clarify substantive regulations that follow.  However, even if we take it as authority for interpreting section 239 itself, it supports a finding that plaintiff worked less than full time between December 3 and 16, 2000.

The Board's remaining ground for affirmance is that plaintiff did not prove that his severance pay from Phoenix Controls was not really salary from MyIndoorAir.  The Board observes that the referee appeared to endorse this theory.  However, the referee did not have a copy of the severance agreement when he issued his findings.  The Board itself did not find that plaintiff's severance pay was really salary, although it stated somewhat ambiguously that it adopted the referee's decision.  In any event, even had the Board found that plaintiff's severance pay was really salary, that finding could not be sustained.

A person may be "unemployed" during a given week even though she or he is receiving severance payments from a former employer.  The reason is that, ordinarily, severance payments are not payable "with respect to" (820 ILCS 405/239 (West 2000)) the period after the employment has ceased.  The test for whether severance pay is really salary is whether the payments are fixed with a view toward the employee's future conduct or needs.  
Kroger Co. v. Blumenthal
, 13 Ill. 2d 222, 227-28 (1958).

The Board observes that plaintiff was terminated from Phoenix Controls only shortly before MyIndoorAir hired him and that there is some evidence of a connection between Phoenix Controls and MyIndoorAir.  The companies were started by the same person.  MyIndoorAir was formerly a unit of Phoenix Controls, and they shared office space for a time.  The Board urges that this evidence demonstrates a connection between plaintiff's firing and his hiring, and it concludes that Phoenix Controls was really paying his starting salary at MyIndoorAir.  The Board asks that we affirm its decision on that ground or remand for the Board to take more evidence on this issue.

Again, we decline to affirm on a theory that the Board did not  use and that rests on evidence that is more susceptible to the opposite interpretation.  The evidence reflects that plaintiff was hired six days after he was terminated; that his weekly severance pay was equal to his weekly salary; and that Phoenix Controls and MyIndoorAir were separate business entities by November 2001. Phoenix Controls' human resources manager testified that her company exercised no role in arranging or drafting plaintiff's contract with MyIndoorAir and that plaintiff's severance package was not salary.

The Board's finding that plaintiff was not unemployed during the period at issue is against the manifest weight of the evidence.  Therefore, plaintiff qualifies for unemployment benefits for that period.  We must remand the cause to the Board so that it may decide how much is due plaintiff.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded to the Board for proceedings consistent with this order.

Reversed and remanded with directions.

CALLUM and GILLERAN JOHNSON, JJ., concur.