HERBERT NOWAK, Plaintiff-Appellant, v. THE RETIREMENT BOARD OF THE FIREMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO, Defendant-Appellee.

First District (6th Division)    No. 1—98—3743

Opinion filed June 30, 2000.—Rehearing denied August 4, 2000.

BUCKLEY, J., specially concurring.

J. Peter Dowd and Ina R. Silvergleid, both of Dowd, Bloch & Bennett, of Chicago, for appellant.

Mary Patricia Burns and Mary Ann Murray, both of Burke, Burns & Pinelli, Ltd., of Chicago, for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Herbert Nowak appeals from the circuit court's judgment affirming defendant Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago's (the Board) denial of his application for duty disability benefits under Article 6 of the Illinois Pension Code (the Code) (40 ILCS 5/6—101 *et seq.* (West 1992)). Plaintiff contends that the administrative decision of the Board is against the manifest weight of the evidence. For the reasons that follow, we hereby affirm.

## STATEMENT OF FACTS

On November 2, 1995, plaintiff Herbert Nowak filed an applica-

tion for duty disability benefits with the Board. The hearing before the Board commenced on November 20, 1995. The matter was continued at the request of Nowak's counsel to January 17, 1996. On January 17, 1996, the Board's attorney informed the Board that he received a letter from Dr. Shermer and a letter from Dr. Cerullo the night before. He asked for additional time to copy the documents for distribution to the Board members. He also suggested that, due to "ambiguities in the medical examination," another medical opinion may be appropriate. Nowak's counsel did not object and the hearing was continued to April 24, 1996. On that day, three witnesses testified: Nowak, Chychula (the paramedic working with Nowak at the time of the accident), and Dr. George Motto. In addition to the witnesses' testimonies, the Board entered into evidence reports from the following physicians: Dr. Shermer, Dr. James Ryan, Dr. F. Todd Wetzel, Dr. Richard Feely, and Dr. Leonard Cerullo.

The relevant evidence before the Board is as follows: According to Nowak, he sustained an injury on October 31, 1994, while on duty. The injury occurred while Nowak was at the scene of an accident on the Dan Ryan expressway. Nowak and his partner were in the ambulance, which was parked in front of an Illinois Department of Transportation (IDOT) truck, when the IDOT truck was struck from behind by a semitrailer truck causing the IDOT truck to crash into the rear of the ambulance. At the time of impact, Nowak was partially seated, leaning forward over the head of a victim. The impact caused Nowak to be thrown backwards toward the front of the ambulance. He may have been unconscious for a short period after impact. Nowak was taken to Mercy Hospital after he and his partner called for the necessary assistance and packed up the ambulance. At Mercy, Nowak was evaluated by an emergency room doctor and released.

According to Nowak, after the accident, he first sought treatment from Dr. Richard Feely, an osteopath. Dr. Feely performed spinal manipulations and acupuncture. Nowak stated that the relief he received from Dr. Feely's treatment lasted only two to four hours and that the physical therapy was not helping him become stronger. According to Nowak, at one point Dr. Feely suggested that he use Chinese herbs. On January 13, 1995, Dr. Feely told Nowak that he was fit to return to duty with the following restrictions: (1) lifting no more than 60 pounds; (2) no stair climbing; and (3) remaining on medication. Dr. Feely signed a return-to-work order for January 17, 1995. Nowak did not return to work.

On January 27, 1995, Dr. Feely sent a narrative report regarding Nowak to Dr. Hugh Russell, the medical director for the Chicago fire department. According to Dr. Feely's report, he first saw Nowak on

November 8, 1994. His diagnosis was cervical strain, cervical myositis and "somatic dysfunction of the head, cervical, thoracic, lumbar, sacrum and pelvis." He had seen Nowak on a twice-weekly basis and had prescribed Lodine and Soma. Dr. Feely last saw Nowak on January 13, 1995, when he signed Nowak's return-to-work order. At that time, Nowak was taking Soma, Fiorinal and Relafen. According to Dr. Feely's report, during the course of treatment, the diagnosis remained the same: "somatic dysfunction of the head, cervical, thoracic, lumbar, sacrum, and pelvis" along with tension cephalagia and occasional insomnia. Dr. Feely recommended that a work fitness examination be performed to determine Nowak's lifting capacity.

On January 19, 1995, Nowak sought a second opinion from Dr. Leonard Cerullo, a specialist in neurosurgery and neuroresearch. After examining Nowak and performing MRI tests on his cervical and lumbar spine, Dr. Cerullo diagnosed Nowak with cervical and lumbar radiculopathy and degenerative disc disease of both the cervical and lumbar spine.

On April 28, 1995, after a follow-up examination of Nowak, Dr. Cerullo wrote a letter to Dr. Russell regarding Nowak. Dr. Cerullo informed Dr. Russell that Nowak "continues to be symptomatic" and has failed to improve over the past three months despite an "excellent outpatient program and continued home exercise program." He indicated that Nowak was taking Relafen and Fiorinal. Dr. Cerullo also informed Dr. Russell that the "MR[I] scan of the lumbar spine shows degenerative disc disease with marked narrowing of the disc space at L5-S1, and a cervical study demonstrated a bulging disc at C5-6 and a degenerated disc at C6-7." Due to Nowak's "failure to improve" Dr. Cerullo recommended a trial of aggressive/conservative therapy in the hospital.

On June 2, 1995, Dr. Cerullo wrote a second letter to Dr. Russell informing him that Nowak had completed a trial of aggressive/conservative therapy for his lumbar radiculopathy at the Chicago Institute of Neurosurgery and Neuroresearch (CINN). He also stated that Nowak had received one steroid injection. Nowak was scheduled for a second injection but it had been postponed due to a change in symptoms, *i.e.*, Nowak was experiencing symptoms in his entire left leg rather than just in his back, buttock and left thigh. Dr. Cerullo recommended that Nowak have another MRI scan.

On June 23, 1995, Dr. Cerullo wrote another letter to Dr. Russell which stated that "[o]ur physical therapist feels that further therapy, transitioning into the work hardening program is indicated." He also stated "I believe [Nowak] should start considering a change in professions. I am not sure that he will be able to return to work as a paramedic."

In the summer of 1995, Nowak actively participated in the work hardening program at the Work Injury Network (WIN). Nowak's discharge summary dated September 1, 1995, indicated that at the conclusion of the program Nowak showed both objective and subjective improvement in his physical function capacity. Nevertheless, the summary concluded that he "cannot currently perform at the physical demand level necessary for his previous position of paramedic with the Chicago Fire Department due to his inability to perform at the Very Heavy Physical Demand Level as outlined by the U.S. Department of Labor's, *Dictionary of Occupational Titles*, DOT#079.364-026."

On September 25, 1995, Dr. Hugh Russell, the medical director for the Chicago fire department, sent a letter to Dr. George Motto, the physician for the Firemen's Annuity and Benefit Fund of Chicago, detailing the course of treatment Nowak had received under the care of Dr. Cerullo. In the letter, Dr. Russell noted that the second MRI done on June 6, 1995, demonstrated narrowing of the L5-S1 disc innerspaces and showed no significant bulging or herniated disc.

In November 1995, Dr. Cerullo notified the Chicago fire department that he did not recommend that Nowak return to his job as a paramedic.

On November 2, 1995, Nowak submitted his application for duty disability benefits to the Board.

Nowak next saw Dr. Motto. On November 15, 1995, Dr. Motto submitted his report to the Board. The report detailed Nowak's course of treatment, Dr. Cerullo's diagnosis through June of 1995, and Dr. Motto's own examination results, which were as follows:

> "[T]he applicant was an alert cooperative man who walked with his head straight and moving his head with not much difficulty but with a straight back. He rose from a chair with some difficulty. He could walk on his heels and toes but could only squat about 50% and could go no further. Range of motion of his lumbar spine was limited to about 75% with flexion, but there was good lateral flexion on both ides. With extension of the back he did complain of pain in his buttock and up his back. Range of motion of the shoulders and neck appeared normal. There was some spasm of the lumbar muscles."

Dr. Motto concluded his report by stating that he had requested that Nowak have Dr. Cerullo forward him a letter stating his exact diagnosis and his reason why he feels Nowak should seek another profession.

At the hearing, Dr. Motto testified as follows: Dr. Motto stated that he was unable to conclude whether Nowak was disabled from his job as a paramedic or whether there is a causal relationship between Nowak's October 31, 1994, accident and his present physical condi-

tion. He stated there are "apparent discrepancies" between the findings contained in the WIN report and Nowak's description of his current physical limitations. Dr. Motto testified:

> "[Nowak] performed, I think it sounded like, very well as a paramedic. To see how an accident of that sort without more objective evidence can result in such a myriad of problems and disabilities just—it raises some—it just raises some questions in my mind. The thing I think that concerns me most is the—I guess is Board Exhibit 11-A, which has been referred to on many occasions. And it is the summary discharge from I guess the WIN program. And I think that the problem I have with this is not so much that it shows that Mr. Nowak cannot function at the very heavy level, but if one reads this in detail, which I have on several times, it shows that he can function at a heavy level, which is markedly advanced or better than he has testified here he can function at.
>
> \*\*\*
>
> I mean, he mentioned he couldn't—he could barely do laundry. He couldn't pick up a laundry basket. He could barely do activities of daily living. By the end of the day he was totally wiped out.
>
> \*\*\*
>
> I don't understand how in August or September I can get a report like that on an individual who says he can't even do very little things around the house.
>
> \*\*\*
>
> Again, I will say that my problem is the amount of disability is totally out of whack with the objective findings. Including it sounds like a very thorough two to three weeks Functional Capacity Evaluation which occurred a couple months after he was under the care of Doctor Cerullo. \*\*\* I don't know what the answer is here. It raises some questions in my mind."

On January 9, 1996, Nowak was evaluated by Dr. Shermer. In addition to conducting his own examination of Nowak, Dr Shermer reviewed the records from Mercy Hospital, Dr. Feely, Dr. Cerullo and WIN, as well as the Board's file on Nowak's application for duty disability benefits. Dr. Shermer's diagnosis was as follows: (1) cervical sprain; (2) cervical disc degeneration, with chronic myofascitis; and (3) lumbar, chronic myofascitis, associated with L5 disc degeneration and instability. He concluded that "[t]he requirements of duty as a paramedic would clearly preclude this patient from performing in such duties in view of the findings noted within the records and the assessments noted, as well as the MRI studies noted."

Nowak was also examined by Dr. Ryan, a specialist in orthopaedic surgery. According to Dr. Ryan's January 23, 1996, report, he took a history from Nowak, performed a physical examination and reviewed Nowak's two prior MRIs. With respect to the MRIs, Dr. Ryan stated:

"The MRI of the lumbar spine done at Columbus Hospital on 6/6/95 shows a mild degenerative changes noted in the lower lumbar spine, particularly at L5-S1. There are no nerve root compressions. He had had a previous MRI on 3/2/95 [*sic*, should be 2/3/95] which was not significantly different that [*sic*] this one I am reporting now. The MRI of the cervical spine on 2/3/95 showed C5-C6 bulging discs, C6-7 degenerative disc disease."

Dr. Ryan concluded:

"The examination of the lumbar spine is really negative for any objective findings. He did demonstrate some instability going from flexion to extension and localizing the pain over L5-S1, particular pain with extension of the lumbar spine at L5-S1. The range of motion is completely normal. \*\*\* He at best has some degenerative disc disease. This is a condition of life. \*\*\* I see nothing here that will require any further formal treatment. On the basis of my physical examination, including all the organic and anatomic findings, there is nothing here that will prevent him from working as a paramedic."

The last physician to evaluate Nowak's medical condition was Dr. Wetzel. Dr. Wetzel concluded that Nowak suffered from degenerative disc disease of the cervical and lumbar spine. Dr. Wetzel also reviewed the results of Nowak's participation in the WIN program. He noted that the program determined that Nowak was "capable of returning to a heavy demand level job." Dr. Wetzel also noted:

"I am not an occupational physician and thus am not qualified to judge whether or not a patient is capable of returning to a particular job. I certainly would however find the results of [the WIN program] to be reasonable as the examination was conducted in what appears to be a reproducible manner."

At the hearing, Nowak testified about his current physical state. He stated:

"Well, I have lower back pain that has radiating pain at times. Usually it is a tingling sensation but if I do too much in a day it turns into pain where it radiates down the entire left leg. Down the right leg down to the knee. I also have a constant sensation that both my great toes feel cold and wet."

He further stated:

"I still have the pain and stiffness between my shoulder blades and pain still does radiate to the right shoulder. I have constant headaches, that vary in magnitude from extremely severe to moderate. I still have some jaw pain with the TMJ. Just shows up occasionally now. That has tapered off from the beginning from when I first was injured. All of these symptoms increase and get worse the more active I am. Even if I bend down correctly it hurts more. At the end of the day it gets very hard to function at all."

When asked about his activities around the house, Nowak responded:

> "I do light things around the house. I try to do things that are not on the floor. Although I will vacuum. When I do it—you know—I vacuum with one hand and I brace my back with my hand on my knee with the other. I try to do things were I can either sit down or stand straight."

When asked about what specifically he does during a normal day, he responded:

> "Do dishes. Do laundry. I don't do much in the way of the yard work any more. Too much bending over. And I try to do as much as I can within my current parameters."

He also stated that he does very little lifting although he can carry two sacks of groceries of equal weight of 15 to 20 pounds each.

On May 15, 1996, the Board voted to deny Nowak's duty disability application. No findings of fact were adopted by the Board.

## DISCUSSION

One of the relevant issues raised by the parties, and an issue of first impression, is whether section 6—153 of the Code requires that the Board receive proof of a claimant's disability from at least one Board-appointed physician prior to granting a disability benefit.

■ Section 6—151 of the Code provides that an active firefighter (including paramedics) who becomes disabled "as the result of a specific injury *** incurred in or resulting from an act or acts of duty, shall have the right to receive duty disability benefit." 40 ILCS 5/6—151 (West 1992). Section 6—153 of the Code provides that "[p]roof of duty *** disability shall be furnished to the Board by at least one licensed and practicing physician appointed by the Board." 40 ILCS 5/6—153 (West 1992). The circuit court determined, in part, that, because no Board-appointed physician found Nowak disabled, he is not entitled to duty disability benefits.

Nowak first argues that he cannot be denied benefits based on section 6—153 because the Board did not raise that argument at the administrative level and, therefore, the argument is waived. In response, the Board contends that it was incumbent upon Nowak to comply with section 6—153 to meet his burden of proof and his failure to do so resulted in the Board's denial of duty disability benefits. In addition, the Board points out that it did raise Nowak's failure to comply with section 6—153 in its brief on administrative review. The Board asserts that Nowak failed to (i) respond or object to the argument in his reply; (ii) orally argue the matter before Judge Green; or (iii) raise the issue of waiver at any time. Thus, the Board contends it

is Nowak who has waived his right to object and cites *Wilfert v. Retirement Board of Firemen's Annuity & Benefit Fund*, 263 Ill. App. 3d 539 (1994), in support.

■ Before reaching the parties' substantive arguments regarding the interpretation and application of section 6—153, we first address the waiver issue. Based on our holding in *Wilfert*, we agree with the Board and find Nowak waived his right to object. In *Wilfert*, a plaintiff sought duty disability benefits and listed only one injury in his application. *Wilfert*, 263 Ill. App. 3d at 546. The plaintiff argued an additional, different injury before the circuit court. On appeal, the Board argued that it was not required to consider the additional injury because the plaintiff did not list the injury in his application and, therefore, the injury was waived. *Wilfert*, 263 Ill. App. 3d at 546. The Board did not, however, make that argument in the circuit court. We held that the Board should have presented its waiver argument before the circuit court when plaintiff first raised the issue of the additional injury. Because the Board failed to object to the issue at that time, we concluded that the Board's objection was waived on appeal. *Wilfert*, 263 Ill. App. 3d at 546. We hold similarly here. Because Nowak did not object to the application of section 6—153 before the circuit court, he has waived any objection before this court.

We now address the interpretation and application of section 6—153. No cases to date have interpreted the language of section 6—153 of the Code. While the Board argues for a literal interpretation, Nowak asserts that the Board has not applied section 6—153 literally in the past. Nowak argues that the Board has interpreted section 6—153 to mean only that an applicant must be examined by the Board's physician, not that an applicant must be found disabled by the Board's physician.

■ "It is well settled that the rules of statutory construction require a court to determine and follow the intent of the legislature using the language of the statute as the most reliable indicator of the legislature's intent. [Citation.] Whether a statutory provision is mandatory or merely directory depends upon the intent of its drafters. [Citation.]" *Hoffman Estates Professional Firefighters Ass'n v. Village of Hoffman Estates*, 305 Ill. App. 3d 242, 250 (1999). Courts have long recognized that the legislature's "use of the word 'shall' is generally considered to express a mandatory reading." *Hoffman Estates*, 305 Ill. App. 3d at 253. Section 6—153 provides that "[p]roof of duty *** disability *shall* be furnished to the Board by at least one licensed and practicing physician appointed by the Board." (Emphasis added.) 40 ILCS 5/6—153 (West 1992). Thus, we find that the plain language of section 6—153 mandates that, before granting a disability benefit, the

Board must receive proof of the claimant's disability from at least one physician appointed by the Board.

We reject Nowak's assertion that such a reading would make the Board-appointed doctor the trier of fact. The Board would not be bound to find a claimant disabled simply because the Board-appointed doctor so found. The Board would still be required to review all of the evidence presented.

Because Nowak failed to meet the requirement of section 6—153, the Board's decision denying him duty disability benefits must be affirmed.

CONCLUSION

For the aforementioned reasons, we hereby affirm the circuit court's order affirming the Board's denial of Nowak's application for duty disability benefits.

Affirmed.

ZWICK, P.J., and CAMPBELL, J., concur.

JUSTICE BUCKLEY, specially concurring:

As my opinion makes relevant, this court's hands are tied by the application of section 6—153 of the Code, and we must affirm the Board's denial of Nowak's application for duty disability benefits. Nevertheless, I feel constrained to comment on the sufficiency of the evidence presented in this case. Before doing so, however, let me point out that I am not the first author of an opinion to write a separate special concurrence. See, e.g., *Abbate v. United States*, 359 U.S. 187, 196, 3 L. Ed. 2d 729, 735, 79 S. Ct. 666, 671 (1959) (where Justice Brennan concurred with his own opinion); *Morizzo v. Laverdure*, 127 Ill. App. 3d 767, 775 (1984) (where Justice Downing concurred with his own opinion).

This court's function on administrative review is to ascertain whether the findings and decisions of the administrative agency are against the manifest weight of the evidence. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). A decision is against the manifest weight of the evidence when an opposite conclusion is clearly evident. See *City of Belvidere*, 181 Ill. 2d at 204.

In my opinion, the overwhelming evidence in this case leads to only one conclusion, that Nowak is unable to perform the job of a paramedic. After treating Nowak over a period of nine months, Dr. Cerullo, Nowak's primary treating physician, determined that Nowak was not physically capable of returning to his position as a paramedic.

The functional capacity evaluation report indicated Nowak "cannot currently perform at the physical demand level necessary for his previous position of paramedic with the Chicago Fire Department due to his inability to perform at the Very Heavy Physical Demand Level." This is an objective report whose validity was not challenged by any of the medical doctors. Dr. Shermer concluded that "[t]he requirements of duty as a paramedic would clearly preclude this patient from performing in such duties in view of the findings noted within the records and the assessments noted, as well as the MRI studies noted." Although Dr. Wetzel declined to give an opinion regarding Nowak's disability status, he did, however, acknowledge the relevance of the functional capacity evaluation and stated that the results appeared to be reasonable.

Moreover, the testimony of Dr. Motto does not support a conclusion that Nowak was not disabled. Although Dr. Motto found objective fault with the WIN report because he could not reconcile Nowak's subjective complaints with the objective findings of the report, the record shows that Dr. Motto misstated Nowak's testimony regarding the subjective complaints. In addition, contrary to the Board's assertion, Dr. Feely never unconditionally returned Nowak to work. In both his January 13, 1995, "Lay Up Certification" form and his January 27, 1995, report to Dr. Russell, Dr. Feely recommended that a "lift test" or a "work fitness examination" be performed to determine Nowak's lifting capacity prior to being returned to "100% full active duty."

Dr. Ryan is the only doctor who unequivocally testified that Nowak is not disabled. However, as Nowak points out, Dr. Ryan did not take into consideration the findings of the WIN report; thus, he lacked the information required to objectively evaluate whether Nowak could return to work as a paramedic.

In sum, I firmly believe that the decision of the Board is against the manifest weight of the evidence. Nevertheless, as stated in the majority opinion, we must affirm.