SIXTH DIVISION   

DECEMBER 22, 2000

No. 1-99-3105

KENNETH WILFERT, ) APPEAL FROM THE

) CIRCUIT COURT

Plaintiff-Appellant, ) OF COOK COUNTY.

)

v. )

)

RETIREMENT BOARD OF THE FIREMEN'S )

ANNUITY & BENEFIT FUND OF CHICAGO, and
 )

the following members of that Board, as )

members thereof: JOSEPH F. QUINN, )

President and Trustee, WILLIAM J. )

WILKINSON, Trustee, NORMAN S. HOLLAND, )

Secretary and Trustee, JAMES F. NOLAN, )

Trustee, PHOEBE S. SELDEN, City )

Comptroller and Ex-Officio Trustee, )

JAMES J. LASKI, City Clerk and )

Ex-Officio Trustee
, MIRIAM SANTOS, City )

Treasurer and Ex-Officio Trustee
, )

JAMES T. JOYCE, Deputy Fire )

Commissioner, Vice-President and )

Trustee, and BARBARA A. LUMPKIN, former )

City Comptroller
 and 
Ex-Officio Trustee,) HONORABLE

) JOHN K. MADDEN,

Defendants-Appellees. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff Kenneth Wilfert appeals an order of the circuit court of Cook County denying his petition for administrative review of the decision by the defendant Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago (Board) to termi­nate Wilfert's duty disability benefits.  This case is related to 
Wilfert v. Retirement Bd. of Firemen's Annuity & Ben. Fund of Chicago
, 263 Ill. App. 3d 539, 640 N.E.2d 1246 (1994), in which this court held that the Board erred in failing to consider the injury Wilfert sustained during "work hardening" when it denied him duty disability benefits.  Wilfert, a paramedic, was first injured when an automobile struck his ambulance.

The record on appeal discloses that on December 17, 1997, the Board commenced a hearing pursuant to section 6-153 of the Illinois Pension Code (40 ILCS 5/6-153 (West 1996)) (Code) to decide whether Wilfert's duty disability payments should be dis­continued.

Dr. George Motto, a physician and consultant for the Board since 1973, testified that once an applicant is granted benefits, he or she is asked to return periodically for re-examination at the discretion of the Board.  Dr. Motto testified that he saw Wilfert in June 1997 and believed that Wilfert should have a Functional Capacity Evaluation (FCE) and possibly a second opinion.

The FCE conducted on August 17, 1997, states that Wilfert:

"tested out at the 
medium-heavy
 physical demand level for work tolerance with a maximum lifting ability of 70 lb from floor to knuckle, 60 lb from knuckle to shoulder and 40 lb from shoulder to overhead levels with complaints of bilateral trapezius muscle tightness and cramping sensation in right hand dorsal web space between thumb and index finger with cumulative lifting.  He also demonstrated the ability to simulate use of stair chair by pulling up and lowering 111 lb up and down one flight of stairs without assis­tance.  This client's job as a paramedic may require him to lift over 100 lb at vari­ous levels in various conditions.  There­fore, due to decreased lift capacity, he was unable to meet job requirements.  
A full duty work recommendation cannot be made at this time
."

The FCE also states that Wilfert "put forth a maximum physical test effort."  The FCE notes that "the position of paramedic rates at the 
very heavy
 physical demand level for work."  The FCE later shows a table of "Physical Characteristics of Work" which rates "Medium Heavy" below "Heavy" and "Very Heavy."

The FCE recommended Wilfert have three to four weeks of physical therapy, followed by a work hardening program of two to three weeks.  The FCE stated that the prognosis for a duty work release recommendation later was "good."  Based on the FCE, Dr. Motto believed that Wilfert should have work hardening "because there didn't seem to be a specific problem and because he was deconditioned."

The record contains a "Discharge Note" from the HealthSouth Center for Physical Therapy & Industrial Rehabilitation, which states that Wilfert had "attended 3 P.T. visits."  Initially, Wilfert "was performing the exercise with more vigor than need­ed"; on his second visit, Wilfert reported "feeling like he just re-injured it for the very first time in 1989."  Wilfert was dis­charged due to lack of progress, with the Discharge Note stating that "P.T. is not indicated at this time."  The Discharge Note stated that Dr. Motto would be notified.  At the hearing, Dr. Motto testified that Wilfert tried work hardening, but it "couldn't be completed."

Dr. Motto testified that Wilfert was then sent to Dr. James Ryan, a Consultant in Orthopedic Surgery, for a second opinion.  Dr. Ryan dictated a report which concludes as follows:

"Basically, aside from [Wilfert's] complaints and pain behavior, I could not find anything clear cut of a neurologic nature, and I noticed previous physicians have had the same problem.  His EMG of 7/11/94 was read and was normal.  On the basis of my physical examina­tion, which was negative, I feel that he is not disabled and may return to full duties after a period of work conditioning, because he has been off from work for so long.  There is no impairment or disability."

Dr. Ryan's report details the examination of Wilfert's left shoulder, including tables showing the active and passive ranges of motion.  Dr. Ryan's report does not contain any description of any test requiring Wilfert to lift weight.

Dr. Motto testified that he also received a letter from Dr. Steven M. Zak, regarding a follow-up examination conducted on November 21, 1997.  Dr. Zak wrote that while Wilfert had improved since October, he was "not yet back to his baseline."  Wilfert was still taking Ibuprofen, Flexeril and Ultram.  Dr. Zak opined that Wilfert had "[c]hronic left-sided cervical polyradiculopathy with possible exacerbation by excessive stretching at physical therapy" and "[p]ossible left supraspinatus tendonitis."

Dr. Zak recommended that Wilfert resume physical therapy at the HealthSouth.  Dr. Zak opined that therapy should be limited to heat, ultrasound and massage, followed by gentle stretching and possible cervical traction if tolerated.  Dr. Zak opined that while the possibility of work hardening could be addressed at a later time, the FCE results showed he was not neurologically able to return to work as a paramedic.  Dr. Zak also noted that if Wilfert's symptoms persisted or worsened, Wilfert would need a follow-up EMG and nerve conduction studies.

At the hearing, Dr. Motto testified that Dr. Zak's letter "had some different recommendations" from those of Dr. Ryan. 

Dr. Motto recommended that Wilfert have work hardening under the direction of Dr. Ryan.  Dr. Motto acknowledged that Dr. Zak is a board certified neurologist whereas Dr. Ryan is an ortho­paed­ist, but opined that an orthopedic surgeon is highly quali­fied to evaluate neurologic problems of the musculoskeletal system.  Dr. Motto testified that he believed Dr. Zak's opinion was based more on the FCE than any of the neurological findings.

Wilfert testified that he understood that he was receiving duty disability benefits due to a neurological injury that prevented him from lifting heavy weights and grasping properly.  Wilfert did not think he could serve as a paramedic in his present condition, but was willing to try therapy.

The Board voted to send Wilfert into a work hardening program and that Dr. Motto should consult with Drs. Zak and Ryan regarding the appropriate course of treatment.

On January 21, 1998, Dr. Motto sent a letter to the Board, stating that he had contacted Dr. Zak, whose only input was that Wilfert should have three to four weeks of physical therapy prior to entering a work hardening program.  Dr. Motto also wrote that he had contacted Dr. Ryan, who agreed to prescribe the therapy, then reevaluate Wilfert prior to a work hardening regime.

Dr. Zak examined Wilfert on January 23, 1998.  A letter from Dr. Zak to Dr. Hugh Russell of the Chicago Fire Department stated that Wilfert's symptoms had not changed significantly.  Dr. Zak's assessment of Wilfert remained largely the same, but added that it was "imperative" that Wilfert have a follow-up EMG and nerve conduction study to ensure he did not have active denervation in the cervical roots or an evolving left carpal tunnel syndrome.

The record contains Wilfert's Discharge Summary from NovaCare Outpatient Rehabilitation, which states that Wilfert had nine visits between February 2-20, 1998.  The report character­izes Wilfert's compliance as "Good," but notes as part of the subjective evaluation that his symptoms worsened with exercise.  The final assessment was that there was little or no improvement and that Wilfert's progress was limited by subjective complaints.  The conclusion was that further physical therapy "would not significantly improve his objective measurements secondary to limiting behavior."

On March 3, 1998, Dr. Ryan examined Wilfert and wrote Dr. Motto that there was no evidence of a polyradiculopathy.  Dr. Ryan concluded that Wilfert could not respond to any further therapy and "already had a work conditioning program."  Dr. Ryan did not recommend another program for Wilfert because "most of his problems are functional and consist of pain and exaggera­tion."  Dr. Ryan wrote that Wilfert was not disabled and should be able to work his regular job without restrictions.

On Wednesday, April 15, 1998, the Board resumed the hearing. Wilfert's counsel sought a continuance, stating that he did not receive materials from the Board, including Dr. Ryan's report, until the late afternoon of the previous Friday.  Board attorney Lawrence Krulewich did not dispute this, but recommended, based on Dr. Ryan's report, that Wilfert's benefits be suspended sub­ject to a decision on the merits.  Wilfert's counsel objected.  The Board granted the continuance without suspending Wilfert's benefits.

On April 17, 1998, Dr. Zak wrote Dr. Russell regarding a follow-up examination of Wilfert, noting that the physical therapy ended without any definite improvement and that there was no follow-up EMG and nerve conduction study.  Dr. Zak repeated his assessment of "[c]hronic left-sided cervical polyradicu­lopathy with possible exacerbation by excessive stretching at physical therapy" and "[p]ossible left supraspinatus tendonitis."  Dr. Zak again noted that based on Wilfert's most recent FCE, he was not neurologically able to work as a paramedic with a very heavy job level description.

On May 20, 1998, the Board resumed the hearing.  Dr. Motto summarized his prior testimony and testified regarding his consultation with Dr. Zak.  Dr. Motto also testified regarding NovaCare's assessment:

"Q Does it mean Mr. Wilfert was not performing at his maximum level?

A Well, it says hard to improve because of the limiting behaviors of pain and the way he was responding that he wasn't progressing at all.

Q So pain could be causing the limitation of behaviors?

A Yes.

Q That term does it suggest malingering or not?

A Well, it suggests -- I would say that it is to the point where I think the therapist put that in because they could not make an objective evaluation because of his  -- because of the behaviors.  Maybe not just pain.

Q We're not saying that this -- this does not necessarily say that Mr. Wilfert is being less than honest in his performance, does it?

A No, it does not."

Dr. Motto then read Dr. Ryan's conclusions into the record.

Mr. Krulewich then asked Dr. Motto about his discussions with Dr. Zak, his review of all the reports and his prior examination of Wilfert, culminating in the following exchange:

Q Based on all of that can you say to a reasonable degree of medical certainty whether or not Mr. Wilfert is still disabled or whether his disability has ceased?

A Say that -- ask me the question again.

Q After reviewing all of the docu­ments I referred to and having the conversa­tion with the doctors that I referred to and doing the examination of Kenneth Wilfert, do you have an opinion to a reasonable degree of medical certainty whether or not Kenneth Wilfert's disability has ceased?

A No.

Q You don't have an opinion?

A I don't have an opinion.

Q Well, this board has the responsibility to pay benefits to a person who's disabled after making a determination of that and to stop payment of benefits to a person whose disability has ceased.

Can you formulate an opinion to a reasonable degree of medical certainty at this point as to whether or not Mr. Wilfert is currently disabled?

[WILFERT'S COUNSEL]:  I think that has already been asked and answered.

MR. KRULEWICH: It hasn't. Counsel.  It is a slightly different question.

BY MR. KRULEWICH:

Q Is he still disabled?

The specific question is do you have an opinion as to whether he's still disabled?

A I understand the question.

Yes.

Q What's your opinion?

A At the present time I believe he is not disabled."

Dr. Motto testified that this opinion was "[b]ased on the evaluations and the consultants."  

Dr. Motto agreed with Dr. Ryan because Wilfert's problems were "primarily subjective," that Dr. Zak's evaluation uses words like "possible" and "probable," nothing definite.  Dr. Motto opined that the subjective complaints were disproportionate to the objective findings, stating that "this is the problem that has run through my mind in this situation from the beginning."

On cross-examination, Dr. Motto acknowledged that the FCE stated that Wilfert was unable to meet the demands of his job.  Dr. Motto admitted that Dr. Ryan's March 3, 1998, report referred to "our prior reports," but that Dr. Ryan had produced only one prior report.  Dr. Motto admitted that there was nothing in either of Dr. Ryan's reports to show that Dr. Ryan ever reviewed or considered the August 1997 FCE.  Dr. Motto admitted that he could point to nothing in Dr. Ryan's reports that discuss Wilfert's work capabilities, or suggest that Dr. Ryan considered or knew the requirements for working as a paramedic.  

Dr. Motto admitted that Dr. Ryan's March 3, 1998, letter did not disclose what tests or procedures were used in examining Wilfert.  Dr. Motto testified that the fact that Dr. Ryan made conclusions was probative of the fact that he made examinations sufficient to reach those conclusions.

Dr. Motto testified that it was necessary to link an injury or condition to a person's job to decide whether that person was disabled.  Dr. Motto stated that this was the purpose of the FCE, but that the FCE was only part of the process.  Dr. Motto added that one must also be of the opinion that a disability exists.

Dr. Motto admitted that a normal EMG does not conclusively establish the absence of a neurological condition.  A person can complain of symptoms such as pain, tingling and numbness and have a normal EMG and nerve conduction study.  In such circumstances, there is an absence of objective evidence of the condition.  Dr. Motto admitted that Dr. Zak wrote him that he needed a new EMG and nerve conduction study, but never told the Board that Dr. Zak wrote that it was "imperative" that these tests be performed.

Wilfert testified regarding the exacerbation of his condition by the physical therapy.  Wilfert testified regarding his medication, stating that he had been told by Chicago Fire Department personnel that he could not work as a paramedic while on the medication.  Wilfert testified that during his examination by Dr. Ryan on March 3, 1998, he had told Dr. Ryan he had four EMGs, two of which showed abnormalities.  According to Wilfert, Dr. Ryan stated he was going to get those reports, review them, and send Dr. Motto a letter.  Wilfert also testified that during this examination, Dr. Ryan performed a test where Dr. Ryan applied pressure to the top of Wilfert's head while in a prone position.  Wilfert testified that when he reported a severe neck pain shooting into his head, Dr. Ryan said that this was normal.

The Board concluded the hearing by taking the matter under advisement.  On June 24, 1998, the Board denied a motion to continue Wilfert's benefits.  On July 31, 1998, Wilfert filed a complaint in administrative review in the circuit court of Cook County.  On August 6, 1999, the circuit court entered an order denying Wilfert's complaint.  Wilfert now appeals.

This is an appeal in administrative review.  In this case, the Board's decision was factual in part, because it involved considering whether the facts supported a ruling that Wilfert's disability had ceased.  However, the Board's decision also concerned a question of law because "disability" is a statutory term referring to a "condition of physical or mental incapacity to perform any assigned duty or duties in the fire service," which is subject to legal interpretation.  See 40 ILCS 5/6-112 (West 1996).  See also 
Carmody v. Retirement Bd. of Fireman's Annuity and Benefit Fund of Chicago
, 305 Ill. App. 3d 600, 605, 712 N.E.2d 870, 873 (1999)(interpreting "disability" under section 6-112 of the Illinois Pension Code).  Thus, this case presents a mixed question of fact and law to which the clearly erroneous standard of review is applicable.  See, 
e.g.
, 
City of Belvidere v. Illinois State Labor Relations Bd.
, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).  Accordingly, the agency's decision is to be affirmed unless the court is left with the definite and firm conviction that a mistake has been committed.  
Friends of Israel Defense Forces v. Department of Revenue
, 315 Ill. App. 3d 298, 303, 733 N.E.2d 789, 793 (2000).

In addition, much of the evidence in this case is documen­tary.  Although factual findings by an administrative agency are held to be 
prima facie
 true, a reviewing court may evaluate docu­mentary evidence 
de novo
.  
Ambrose v. Thornton Township School Trustees
, 274 Ill. App. 3d 676, 680-81, 654 N.E.2d 545, 548 (1995).

Wilfert argues that the overwhelming weight of the competent evidence showed he remained disabled.  The Board relied on the testimony of Dr. Motto and the reports of Dr. Ryan.  The weight accorded an expert opinion is measured by the facts supporting it and the reasons given for it; an expert opinion cannot be based on guess, surmise or conjecture.  
Doser v. Savage Mfg. and Sales, Inc.
, 142 Ill. 2d 176, 195-96, 568 N.E.2d 814, 823 (1990); 
Simers v. Bickers
, 260 Ill. App. 3d 406, 412-13, 632 N.E.2d 219, 223-24 (1994).  A disability decision is not only clearly erroneous, but also against the manifest weight of the evidence, where the medical opinion was based upon conjecture.  
MacDonald v. Board of Trustees of Park Ridge Police Pension Fund
, 294 Ill. App. 3d 379, 384, 690 N.E.2d 636, 640 (1998).

For example, in 
Sullivan v. Retirement Bd. of Firemen's Annuity & Benefit Fund of Chicago
, 267 Ill. App. 3d 965, 642 N.E.2d 727 (1994), the Board denied permanent duty disability benefits to a paramedic related to a back injury.  This court  determined that Dr. Russell's findings, corroborated by Dr. Motto's testimony, could not sustain the Board's decision that plaintiff was not disabled.  The record showed that Dr. Russell's report was relatively perfunctory, misstated the results of Sul­li­van's tests and could not be reconciled with the findings of the medical professionals who examined and treated Sullivan.  The results of Sullivan's FCE, which Dr. Motto had testified was the most objective measure of functional capacity, showed that plain­tiff was unable to perform the tasks of his job.  A B200 compu­terized weight-lifting test showed that Sullivan had exerted consistent effort, yet scored low in range of motion, isometric tests, and in functional back strength.  Dr. Russell's report contained no mention of these results.  While the Board vaguely suggested Sullivan may have been malingering, this court found no support for that suggestion in the record.  
Sullivan
, 267 Ill. App. 3d at 971-72, 642 N.E.2d at 731.

In 
Nowak v. Retirement Bd. of Firemen's Annuity and Benefit Fund of Chicago
, 315 Ill. App. 3d 403, 733 N.E.2d 804 (2000), this court affirmed a denial of duty disability benefits to a paramedic diagnosed with cervical and lumbar radiculopathy, based on statutory grounds not raised by the Board here.  Justice Buckley took the unusual step of specially concurring in the opinion he authored to note that he otherwise believed that the Board's decision was against the manifest weight of the evidence.  315 Ill. App. 3d at 412, 733 N.E.2d at 810 (Buckley, J., special­ly concurring).  Justice Buckley noted that the treating physic­ian and the objective FCE both concluded that Nowak was unable to perform as a paramedic.  315 Ill. App. 3d at 412-13, 733 N.E.2d at 811 (Buckley, J., specially concurring).  While Dr. Motto had found fault with the work hardening program report concluding Nowak was unable to perform as a paramedic because Dr. Motto could not reconcile Nowak's subjective complaints with the objec­tive findings of the report, the record showed that Dr. Motto misstated Nowak's testimony regarding the subjective complaints.  315 Ill. App. 3d at 413, 733 N.E.2d at 811 (Buckley, J., special­ly concurring).  Justice Buckley further wrote that Dr. Ryan, the only doctor to unequivocally testify that Nowak was not disabled, did not consider the findings of the work hardening program and thus lacked the information required to objectively evaluate whether Nowak could work as a paramedic.  315 Ill. App. 3d at 413, 733 N.E.2d at 811 (Buckley, J., specially concurring).

This case is disturbingly similar to 
Sullivan
 and 
Nowak
.  Wilfert is a paramedic who has been consistently diagnosed by his treating physician with a radiculopathy.  Dr. Ryan disagreed, but provided no explanation for the problem of pain that Dr. Ryan states does exist.  The record shows that Dr. Ryan's report was as conclusory as Dr. Russell's report was in 
Sullivan
.  Dr. Motto testified that the fact that Dr. Ryan made conclusions was probative of the fact that he made examinations sufficient to support them, but this assumption lacks any factual basis in the record.  Indeed, Wilfert's counsel brought out factual inaccura­cies in Dr. Ryan's reports, including the statement that Wilfert "already had a work hardening program."

As in 
Nowak
, Dr. Motto noted that the subjective complaints were disproportionate to the objective findings.
(footnote: 1)  Dr. Motto has 
always
 characterized Wilfert's complaints as "subjective with minimal objective findings."  
Wilfert
,  263 Ill. App. 3d at 541, 640 N.E.2d at 1248.  While Dr. Motto may have truthfully testi­fied that "this is the problem that has run through my mind in this situation from the beginning," he also opined that Wilfert was disabled when he first applied for benefits.  
Wilfert
, 263 Ill. App. 3d at 541, 640 N.E.2d at 1248.

   Moreover, as in 
Nowak
, Dr. Motto misstated evidence.  Dr. Motto testified that Dr. Zak's assessments contained "nothing definite," just conditions that were "probable" or "possible."  The record shows that Dr. Zak's reports state that Wilfert had a chronic left-sided cervical polyradiculopathy; only the exacerba­tion of that condition was listed as "possible."

In sum, the record lacks any credible factual basis for the conclusion that Wilfert no longer suffered from the same injuries that led to his receipt of duty disability benefits.

Turning to the job-related element of the disability deter­mination, the FCE found that Wilfert was unable to meet the job requirements of a paramedic.  Dr. Motto testified that the FCE was only "part of the process," but did not contradict his testi­mony in 
Sullivan
 that the FCE was the most objective measurement of functional capacity.  The Discharge Summary from NovaCare Outpatient Rehabilitation stated that there was little or no improvement.  Moreover, when the objective tests show that the applicant is unable to perform, exaggeration would seem to be relevant only to a claim of malingering.  Dr. Motto avoided a direct answer to direct questioning on the subject.  Dr. Ryan's report claims Wilfert is exaggerating.  However, the FCE states that Wilfert put forth maximum effort.  The NovaCare Discharge Summary states his compliance was good.  The HealthSouth Discharge Note states that Wilfert tried to do too much at the outset of therapy.  Thus, as in 
Sullivan
, the suggestion of malingering is negated by the objective evidence.

Moreover, as in 
Nowak
, Dr. Ryan's report does not consider the objective testing that concluded Wilfert was unable to perform as a paramedic.  Indeed, Dr. Ryan's report does not even suggest that Dr. Ryan is aware of the standards and job demands by which paramedics are to be evaluated.

In 
Nowak
, Dr. Motto testified that he was unable to conclude whether Nowak was disabled.  
Nowak
, 315 Ill. App. 3d at 407, 733 N.E.2d at 807.  In this case, Dr. Motto opined that Wilfert's disability had ceased.  However, the transcript shows that Dr. Motto first testified that he had no opinion to a reasonable degree of medical certainty on this ultimate issue.  

Indeed, the transcript shows that Dr. Motto gave an opinion over Wilfert's objection, after repeated questioning from the Board's attorney, including a "reminder" to Dr. Motto that the Board had a responsibility to stop paying benefits to a person whose disability has ceased.  That responsibility, however, cannot require  a doctor to render an opinion to a reasonable degree of medical certainty if in fact the doctor does not hold such an opinion.  Nor should that responsibility result in the reinstatement of a person as a paramedic who cannot meet established weightlifting requirements for the job.

The Board claims that Dr. Motto initially did not understand the question.  The record shows that Dr. Motto asked that the question be repeated once.  A misunderstanding thereafter seems unlikely in light of Dr. Motto's years of experience, which included attending hearings such as this and answering the Board's questions on the issue of whether an applicant has a disability.  The transcript does not show that the question was confusing or poorly phrased.

Even 
if the Board's reading of the transcript is correct, Dr. Motto testified that his opinion was "[b]ased on the evalua­tions and consultants."  As the discussion above shows, Dr. Motto's opinion and Dr. Ryan's opinions lack a factual basis in this record and are often contradicted by the tests and reports Drs. Motto and Ryan ordered.  

In sum, the Board's decision here was clearly erroneous; indeed, it was against the manifest weight of the evidence.

The Board's error was compounded by its allocation of the burden of proof.  The Board maintains that Wilfert's burden of establishing an entitlement to duty disability payments remains with him when he is re-examined pursuant to section 6-153 of the Illinois Pension Code (40 ILCS 5/6-153 (West 1996)).  Section 6-153 is silent on the issue.  

The parallel provision of the Illinois Pension Code govern­ing cities with populations under 500,000 requires satisfactory proof to the Board of recovery.  40 ILCS 5/4-112 (West 1996).  Article Six of the Illinois Pension Code serves an equivalent purpose to the objectives of worker's compensation and should be liberally construed in favor of the applicant to achieve its beneficent purpose.  
Wilfert
,  263 Ill. App. 3d at 543, 640 N.E.2d at 1249.  The burden of proof for terminating worker's compensation benefits falls on the employer.  See, 
e.g.
, 
Fermi National Accelerator Lab v. Industrial Commission
, 224 Ill. App. 3d 899, 911, 586 N.E.2d 750, 758 (1992).  Also, the moving party in a proceeding generally carries the burden of proof.  See, 
e.g.
, 
Iwanski v. Streamwood Police Pension Bd.
, 232 Ill. App. 3d 180, 184, 596 N.E.2d 691, 694 (1992).  As Wilfert already was awarded benefits, the Board appears to be the moving party in seeking to discontinue them.  Improperly shifting the burden of proof is plain error.  See, 
e.g.
, 
Wayne County Press, Inc. v. Isle
, 263 Ill. App. 3d 511, 513, 636 N.E.2d 65, 66-67 (1994).

In this case, the transcript and the Board's brief make clear that the Board believed the burden was on Wilfert to show he remained disabled, rather than on the Board to show his disability had ceased.  This was plain error.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is reversed.  This case is remanded to the circuit court for a determination of any sum the Board owes plaintiff.

Reversed and remanded for further proceedings.

BUCKLEY, J., and GALLAGHER, J., concur.

FOOTNOTES
1:  Dr. Motto testified that an EMG is objective and that Wilfert's most recent EMG was normal, but admitted that a normal EMG does not conclusively establish the absence of a neurological condition.  Also, no EMG or nerve conduction study had been performed since 1994, and Dr. Motto did not order new tests or even advise the Board that Wilfert's treating physician had written that new tests were "imperative."  Given this record, Dr. Motto's reliance on the lack of objective testing is ironic.